DUGAN & MEYERS CONSTRUCTION CO., INC.
et al., Appellees and Cross–Appellants,

v.

STATE of OHIO DEPARTMENT OF ADMINISTRATIVE
SERVICES et al., Appellants and Cross–Appellees.

[Cite as Dugan & Meyers Constr. Co., Inc. v. Ohio Dept.
of Adm. Servs., 162 Ohio App.3d 491, 2005-Ohio-3810.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 03AP–1194.

Decided July 28, 2005.

492

494

[redacted]

Thompson Hine, L.L.P., Peter D. Welin, and Daniel F. Edwards, for appellee Dugan & Meyers Construction Co., Inc.

Jim Petro, Attorney General, and William C. Becker, Assistant Attorney General, for appellants Department of Administrative Services and the Ohio State University.

Vorys, Sater, Seymour & Pease, Joseph A. Brunetto, and William G. Porter, Special Counsel for the Ohio State University.

SADLER, Judge.

{¶ 1} Defendants-appellants, the Ohio Department of Administrative Services ("ODAS") and the Ohio State University ("OSU"), appeal from a judgment of the Ohio Court of Claims against appellants and in favor of plaintiff-appellee, Dugan & Meyers Construction Co., Inc. ("D & M" or "appellee") in the amount of $2,749,069.37, plus prejudgment interest in the amount of $752,623.37. D & M has filed a cross-appeal, arguing that it is entitled to additional damages that it unsuccessfully sought below.

{¶ 2} This appeal arises from a contract with respect to which ODAS engaged D & M to perform lead-contractor services and to act as the prime contractor for the general-trades portion of a project involving the construction of three buildings that constituted Phase II of the Fisher College of Business on the OSU campus. The plans and specifications for the project were first made available to bidders the week of May 16, 1997, and competitive bidding for the project occurred during the week of June 18, 1997. As a result thereof, in accordance with R.C. Chapter 153 and R.C. 9.312, ODAS awarded the contract to D & M, which was the lowest responsive and responsible bidder.

{¶ 3} The parties entered into the contract on August 15, 1997. As lead contractor, appellee was required to coordinate the work of all of the prime contractors, including preparing and maintaining the project's schedule. Appellee's scope of work as prime contractor for general trades included the construction of the concrete shells for all three buildings, as well as the buildout for the buildings' interiors. The original contract price was $20,932,500. The value of all prime contracts was $32,988,379 and was to be paid from $24,400,000 in funds appropriated for the project by the Ohio General Assembly, plus additional, private funding.

{¶ 4} A notice to proceed was issued on August 15, 1997. The contract between ODAS and D & M specified that the Resource Center Building would be completed within 630 days of the notice to proceed, or by May 13, 1999, and that the Undergraduate and Executive Education Buildings would be completed within 660 days of the notice to proceed, or by June 12, 1999. The contract included a provision that time was of the essence and another provision for the assessment of liquidated damages in the amount of $3,000 per day, in the event that completion was delayed.

{¶ 5} ODAS was responsible for general administration of the project, and Karlsberger & Associates ("Karlsberger") was engaged as the associate architect. In that capacity, Karlsberger was responsible for preparing the construction drawings and specifications, visiting the job site to observe the project as built, approving shop drawings, responding to requests for information ("RFIs") sent by the contractors, and administering any design changes necessitated by any conflicts or discrepancies in the plans or specifications that were identified through the RFI process.

{¶ 6} Korda/Nemeth Engineering, Inc. ("Korda") prepared the engineering plans and specifications, as a subconsultant to Karlsberger. Pursuant to its contractual duties to OSU, Karlsberger certified, by letter dated April 30, 1997, that it had completed coordination of the structural and architectural drawings with the mechanical, electrical, plumbing, and fire-protection drawings prepared by Korda. Tom Snearey of Karlsberger served as the senior project coordinator and had the primary responsibility for responding to RFIs from the contractors. Todd Cooper served as project manager on behalf of appellee, and Robert Fredelake was appellee's project executive.

{¶ 7} ODAS retained Gilbane Building Company ("Gilbane") to act as the construction manager. In that capacity, Gilbane was responsible for reviewing and approving the lead contractor's (D & M's) initial construction schedule, monitoring the schedule, processing and negotiating change orders, assisting the associate architect and OSU with processing of payment applications, assisting in the review and approval of shop drawings, and overseeing job-site safety and cost controls. Gilbane was charged with holding weekly progress meetings, which included representatives of the prime contractors, associate architect, and owner (OSU) and to resolve any scheduling issues that arose at these meetings.

{¶ 8} Pursuant to its contract with ODAS, D & M, in its capacity as lead contractor, was responsible for coordinating the work of all of the contractors and for developing a critical-path-method construction schedule. D & M was required to publish monthly schedule updates and to propose an affirmative recovery plan in the event that it appeared that any activities along the critical path, certain schedule milestones, or contract completion dates would not be met.

{¶ 9} Commencement of work was delayed due to the temporary unavailability of structural steel. This precipitated an agreed no-cost change order that extended the contract completion dates to June 11, 1999, for the Resource Center and July 12, 1999, for the Undergraduate and Executive Education Buildings. D & M made no further written requests for extensions of time.

{¶ 10} The initial or baseline construction schedule was not approved until January 1998, but work did commence on the project in August 1997, shortly after issuance of the notice to proceed. In February 1998, ODAS assigned to OSU its responsibility for administering Phase II construction contracts on behalf of the state. This was done in order to save OSU $418,000 in administrative fees that OSU would otherwise have owed to ODAS for providing such contract administration services. All Phase II prime contractors, including D & M, executed no-cost change orders acknowledging that assignment. After February 27, 1998, ODAS had no on-site representative in place for the project.

{¶ 11} The construction work progressed on schedule throughout the first year of the project, and appellee's monthly schedule updates consistently forecast completion of the project within the extended completion dates for each building. However, beginning in June 1998, work was delayed significantly. Between June 1998 and the end of September 1998, for instance, 176 RFIs had been submitted, and 48 field work orders ("FWOs") and 15 architect supplemental instructions ("ASIs") had been issued.

{¶ 12} This process took place as follows. Contractors or subcontractors would initiate RFIs. For each RFI that did not require a change to the contract, the RFI would be returned to the issuing contractor with the response written directly thereon. If the response required a change to the plans or specifications but did not involve additional time or an increase in the contract price, an ASI would be issued. If the response required a change to the plans or specifications and did involve additional time or an increased contract price, an FWO would be issued, followed by a written change order. A contractor was not permitted to proceed with work involving a change to the plans or specifications until an ASI or FWO had been issued that authorized the change. Responses to RFIs were due within three days of receipt of the RFIs.

{¶ 13} Each RFI form contained a space within which the issuing contractor could indicate any effect the RFI was expected to have on the construction schedule or the cost of the project. Appellee reported no cost effect on any RFI that it issued and attributed only four days of delay to any of its RFIs. Additionally, each FWO contained the following preprinted language:

> The compensation or time extension provided by this Change Order constitutes full and complete satisfaction for all direct and indirect costs, and interest

related thereto, which has been or may be incurred in connection with this change to the work.

{¶ 14} Representatives of the parties held special meetings in the fall of 1998 in order to try to resolve the issue of delay, and by February 1999, appellee's schedule update indicated a projection for project completion beyond the contract end dates. In early April 1999, OSU, the associate architect and Gilbane indicated to appellee that it was most critical to complete the Undergraduate Building and several floors of the Resource Center by the contract completion date, because these were the areas most needed for holding classes, and that if these could be completed within original time limits, extensions might be obtained for the remaining portions of the Resource Center. Unfortunately, however, progress continued to be slow in May and June 1999, with the continued submission and issuance of RFIs, ASIs, and FWOs, but with no requests for further extensions of time.

{¶ 15} On June 28, 1999, Snearey sent a "72–Hour Notice" letter to Fredelake, informing him that appellee had "failed or neglected to prosecute the work with the necessary diligence so as to complete the work by the applicable milestones and the time specified in the Contract." The letter gave appellee three working days in which to "implement an acceptable program" for curing the problem, after which, absent cure, the associate architect would recommend to OSU that "additional forces" be employed. Appellee responded with suggestions for remediation, but the associate architect deemed the response "insufficient to meet [its] contractual responsibilities" because the items contained therein were, variously, vague, unclear, unrealistic, or not relevant to the issues identified in the 72–hour notice.

{¶ 16} Thus, by letter dated July 2, 1999, the associate architect recommended that Gilbane "take over some of the Lead Contractor's responsibility for scheduling the work and coordination of the prime contractors." Specifically, this included the responsibilities under Articles 4.2.2, 4.2.3, 4.3.4, 4.3.5 and 4.2.6 of the contract's General Conditions ("GC") and General Requirements 01200—1.05.A.

{¶ 17} Under Gilbane's direction as lead contractor, the Undergraduate Building and the Resource Center were completed in time for fall quarter classes in 1999, and the Executive Education Building was not completed until January 2000, roughly six months after the contract completion date. OSU deducted from D & M's contract price the amount of $264,340 in order to pay Gilbane for the lead contractor services it performed after D & M was removed from this part of the project.

{¶ 18} OSU also assessed liquidated damages against D & M for part of the delay in the amount of $325,000. OSU apportioned the remainder of the delay to other contractors and did not apportion any of the delay to itself. Gilbane

representatives testified that OSU apportioned the delay equitably based upon design team members' assessment of the relative responsibility for the delay attributable to D & M and to other contractors. However, as noted earlier, the parties' agreement did not require OSU to engage in such equitable apportionment; rather, it was contractually permitted to assess liquidated damages against D & M in the amount of $3,000 per day.

{¶ 19} Thereafter, D & M filed a claim, pursuant to Article 8 of the contract, in which it sought to recover its contract balance, reversal of the liquidated damages, and extra amounts attributed to its alleged delay damages. After following the procedures set forth in Article 8 of the contract, OSU rejected appellee's claim. GC Article 8 provided:

> Any claim against the State shall be made in writing to the Associate and filed prior to Contract Completion, provided the Contractor notified the Associate no more than ten (10) days after the initial occurrence of the facts which are the basis of the claim. Failure of the Contractor to timely provide such notice shall constitute a waiver by the Contractor of any claim for additional compensation or for mitigation of Liquidated Damages.

Among the items of information required to be included in any such written claim is information regarding "[a]ctivities on the Construction Schedule affected by the claim or new activities created by any delay and the relationship with existing activities," and "[a]nticipated duration of any delay." GC 8.1.1.3—8.1.1.4.

{¶ 20} Other relevant provisions included GC Section 1.5.2.1, which provided:

> If the Contractor finds any perceived conflict, error, omission or discrepancy on or between the Drawings and Specifications, or any of the Contract Documents, the Contractor, before proceeding with the Work, shall submit a written request to the Associate for an interpretation or clarification. The Contractor shall be responsible for the prompt delivery of such request.

Similar language was contained in the instructions to bidders, which stated:

> The Bidder shall examine all Contract Documents, including without limitation the Drawings and Specifications for all divisions of Work for the Project, noting particularly all requirements which will affect the Bidder's Work in any way.
>
> * * *
>
> If the Bidder finds any perceived conflict, error, omission or discrepancy on or between the Drawings and Specifications, or any of the Contract Documents, the Bidder shall submit a written request to the Associate for an interpretation or clarification.

Instructions to Bidders, Article 2, Sections 2.1.1 and 2.3.1. Section 2.3.4 provided that the bidder would not be compensated, after contract execution, for any claim

based upon insufficient data, incomplete contract documents, or incorrectly assumed conditions, if no request for interpretation was made prior to the opening of bids.

{¶ 21} GC Section 6.3 stated:

Any extension of time granted pursuant to paragraph GC 6.2 shall be the sole remedy which may be provided by the Department. In no event shall the Contractor be entitled to additional compensation or mitigation of Liquidated Damages for any delay listed in paragraph GC 6.2, including, without limitation, costs of acceleration, consequential damages, loss of efficiency, loss of productivity, lost opportunity costs, impact damages, lost profits or other similar remuneration.

{¶ 22} Appellee instituted this action against appellants, in the Ohio Court of Claims, for breach of contract and, alternatively, for unjust enrichment. Appellants asserted counterclaims for breach of contract, seeking liquidated damages, plus damages for the cost of replacing appellee with Gilbane. The case was tried before a referee over 17 days between February 10, 2003, and March 5, 2003. On June 27, 2003, the referee rendered a 74–page decision in which he made findings of fact and conclusions of law and recommended that appellee recover $602,745 as the balance of its contract; $589,840 in reverse back charges, which included a complete reversal of the liquidated damages that OSU had assessed; and $730,760 in delay damages, or "cumulative impact" damages, plus an additional $73,076 representing a ten percent profit margin in those damages. The referee denied appellee recovery on several claims, including unabsorbed home-office overhead damages and lost profits.

{¶ 23} All parties filed objections to the referee's decision, all of which the trial court overruled. The trial court adopted the referee's decision as its own, with the exception of a few items, including prejudgment interest, which the trial court modified. Appellants appealed to this court, and appellee asserted a cross-appeal. Appellants have set forth the following ten assignments of error for our review:

Assignment of Error No. 1

The trial court erred as a matter of law because the $730,760 award to Dugan & Meyers for cumulative impact damages has no basis in Ohio law and is contrary to the express provisions of the contract.

Assignment of Error No. 2

The trial court erred as a matter of law when it held that the exclusionary language contained in the executed change orders did not bar Dugan & Meyers' claims.

Assignment of Error No. 3

The trial court erred as a matter of law and fact when it allowed Dugan & Meyers to use the total cost recovery theory to measure its alleged cumulative impact damages.

Assignment of Error No. 4

The trial court erred as a matter of law when it held that the express terms of the contract did not preclude an award of damages for delay.

Assignment of Error No. 5

The trial court erred as a matter of law and fact when it held that the design documents were defective.

Assignment of Error No. 6

The trial court erred as a matter of law and fact when it held that design errors were the cause of the delays.

Assignment of Error No. 7

The trial court erred as a matter of law in holding that Dugan & Meyers did not waive any claim for extension of time or mitigation of liquidated damages by failing to request an extension in writing under the contract.

Assignment of Error No. 8

The trial court erred as a matter of law in holding that Dugan & Meyers did not waive its claim even though it failed to give written notice as required by Article 8 of the contract.

Assignment of Error No. 9

The trial court erred as a matter of law and fact when it awarded Dugan & Meyers damages relating to its removal as lead contractor where Dugan & Meyers failed to provide any competent evidence of its actual damages.

Assignment of Error No. 10

The trial court erred as a matter of law by holding that Dugan & Meyers is entitled to prejudgment interest at the rate of 10% per annum.

{¶ 24} On its cross-appeal, D & M asserts three assignments of error as follows:

ASSIGNMENT OF ERROR I

The court misapplied City of Gahanna v. Eastgate Properties, Inc. by denying Dugan & Meyers direct damages in the form of its contract profits.

ASSIGNMENT OF ERROR II

The trial court misapplied Ohio law by failing to award Dugan & Meyers its unabsorbed home office overhead damages resulting from suspensions, delays, and extensions resulting from the state's breach of contract.

ASSIGNMENT OF ERROR III

The trial court erred in finding that the state's illegal assignment of contract administration from the Department of Administrative Services to the Ohio State University had no effect on the rights and remedies of the parties.

■ {¶ 25} We begin with the appeal. In their first assignment of error, appellants argue that Ohio law does not recognize claims for so-called cumulative-impact damages (also called "delay damages") and that, to the extent that such a claim would be recognized in this state, recognition is not warranted by the facts of this case.

{¶ 26} In the court below, the referee awarded delay damages based on the case of *United States v. Spearin* (1918), 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166. In that case, the United States Supreme Court affirmed an award of damages to a contractor to compensate it for delays it experienced during the construction of a dry dock at the Brooklyn Navy Yard. The particular location of the proposed dry dock required that Spearin first complete the diversion and relocation of a section of a sewer that intersected the site chosen for the dry dock. The government-prepared plans and specifications prescribed separate requirements for this sewer diversion and relocation in addition to the requirements for the dry-dock construction itself.

{¶ 27} Though the contractor performed the work in accordance with the plans, the sewer broke in several places and flooded the excavation of the dry dock. It was determined that these breaks were caused by internal pressure that had built up as a result of heavy rains having been diverted to the sewer by a dam that was not included in the plans and blueprints, even though it was part of the same city sewer system to which the relocated sewer belonged. The dry dock was finally completed more than 15 months later, but only after the government "radically changed and enlarged" the plans and completely discontinued use of the intersecting sewer and then reconstructed it by modifying its size, shape, and material so as to remove the danger of bursting under internal pressure.

{¶ 28} The *Spearin* court held that "if the contractor is bound to build according to the plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications. * * * This responsibility of the owner is not overcome by the usual clauses requiring builders to visit the site, to check the plans, and to inform themselves of the requirements of the work." Id., 248 U.S. at 136, 39 S.Ct. 59, 63 L.Ed. 166.

{¶ 29} In so holding, the *Spearin* court relied heavily on the fact that the plans contained precise requirements for the character, dimensions and location of a sewer, the successful diversion and relocation of which was vital to the construction of the dry dock. The court noted:

The risk of the existing system proving adequate might have rested upon Spearin, if the contract for the dry-dock had not contained the provision for relocation of the 6–foot sewer. But the insertion of the articles prescribing the [diversion and relocation] of the sewer imported a warranty that, if the specifications were complied with, the sewer would be adequate. This implied warranty is not overcome by the general clauses requiring the contractor to examine the site, to check up the plans, and to assume responsibility for the work until completion and acceptance. The obligation to examine the site did not impose upon him the duty of making a diligent enquiry into the history of the locality with a view to determining, at his peril, whether the sewer specifically prescribed by the Government would prove adequate. The duty to check plans did not impose the obligation to pass upon their adequacy to accomplish the purpose in view.

Id. at 137, 39 S.Ct. 59, 63 L.Ed. 166.

{¶ 30} In our view, the implied warranty of the adequacy of the plans and specifications, identified in *Spearin,* is not appropriately invoked in the present case. The Court of Claims interpreted the so-called *Spearin* doctrine to stand for the proposition that OSU warranted the plans and specifications it furnished against any problem, need for clarification, minor deficiency, or subsequent deviation. *Spearin* does not stand for the proposition that owners, by virtue of having furnished the plans and specifications for the job, will indemnify and hold contractors harmless for all delays occasioned by agreed changes in the work necessitated by some force not within the complete control of the contractor.

{¶ 31} This is true even where, as here, the contractor issued a large number of RFIs. The referee was clearly persuaded to award delay damages because of the sheer numerosity of the RFIs. However, the record fails to demonstrate that the substantive concerns addressed in any one RFI or group of RFIs rendered the owner-furnished plans unbuildable or otherwise wholly inadequate to accomplish the purpose of the contract.

{¶ 32} This court did apply the *Spearin* case in *Sherman R. Smoot Co. of Ohio v. Ohio Dept. of Adm. Servs.* (2000), 136 Ohio App.3d 166, 736 N.E.2d 69. In that case, we reversed the lower court's denial of a contractor's claim for additional compensation to cover the cost of having to use more expensive form footings rather than trench footings. We invoked the *Spearin* doctrine in *Smoot* because the contract documents specifically represented that the soil on the site would permit the use of trench footings, when in actuality the soil was not cohesive enough for this and instead required greater excavation for form footings.

{¶ 33} It was appropriate to invoke the *Spearin* warranty in favor of the contractor in *Smoot* for two reasons. First, the contractor specifically relied on the *representation in the contract documents* that trench footings should be and

could be used. Second, in that particular case, the job site did not exist at the time of bidding, so it would have been impossible for the contractor to discover for itself that trench footings would be inadequate, by conducting a reasonable prebid inspection, and to adjust its bid accordingly.

{¶ 34} We decline to permit the extension of the *Spearin* warranty in this case, in which there is no evidence of one identifiable defect or set of defects in the plans and specifications that proved to be so unassailable that the contractor's mere performance of the contract served to undermine the basic purpose thereof. Rather, we believe that the principle most appropriately culled from the *Spearin* case and applied to the present dispute over delay damages is the following: "Where one agrees to do, for a fixed sum, a thing possible to be performed, he will not be excused or become entitled to additional compensation, because unforeseen difficulties are encountered." *Spearin*, supra, 248 U.S. at 136, 39 S.Ct. 59, 63 L.Ed. 166. The record does not support the trial court's use of the *Spearin* doctrine. Thus, appellants' first assignment of error is sustained.

{¶ 35} In their second assignment of error, appellants urge this court to reverse the trial court's award of delay damages, or cumulative-impact damages, on the further basis that the exclusionary language contained in the executed change orders precludes delay damages. In their third assignment of error, appellants argue that the court erred in basing the award of delay damages on the "total cost recovery theory." In their fourth assignment of error, appellants argue that Section 6.3 of the contract, which contains a no-damage-for-delay clause, precludes delay damages. In their fifth and sixth assignments of error, appellants argue that the trial court erred in finding that the design documents were defective and that design errors were the cause of the delays upon which appellee based its claim for delay damages. In their eighth assignment of error, appellants argue that the trial court erred in finding that appellants had actual notice of appellee's claims for delay damages, and in overlooking appellee's failure to give prompt, written notice of its claims for delay damages, pursuant to Article 8 of the contract.

{¶ 36} Our disposition of appellants' first assignment of error renders moot their second, third, fourth, fifth, sixth, and eighth assignments of error.

{¶ 37} In their seventh assignment of error, appellants argue that the trial court erred in rejecting appellants' position that appellee's failure to make written requests for extensions of time or mitigation of liquidated damages constituted a waiver of any claims for mitigation, or reversal, of liquidated damages. Specifically, appellants direct our attention to GC Article 6, which provides:

Any request by the Contractor for an extension of time shall be made in writing to the Associate no more than ten (10) days after the initial occurrence

of any condition which, in the Contractor's opinion, entitles the Contractor to an extension of time. Failure to timely provide such notice to the Associate shall constitute a waiver by the Contractor of any claim for extension or for mitigation of Liquidated Damages.

GC Section 6.4.

{¶ 38} Appellee does not dispute that it failed to request extensions of time. Rather, it argues that submitting requests for extensions of time would have been futile because OSU had made it clear that no extensions of time would be granted. According to appellee, it should not be required to do a vain act, even if the act is required by the unambiguous terms of a contract. Specifically, appellee cites four pieces of trial testimony as evidence that "the State would not extend the Project schedule * * * due to external factors related to classroom scheduling."

{¶ 39} But a thorough review of all of this testimony reveals that none of it proves, or even supports the inference, that appellants refused to grant time extensions, or would have done so had requests been made. At most the testimony demonstrates that all parties were aware that if completion of the project (and particularly the Undergraduate Building and the Resource Center) was delayed beyond the start of the fall quarter, OSU did not have alternative arrangements in place for holding many of the classes that the College of Business had planned to conduct.

{¶ 40} The fact that OSU had likely not prepared itself for a delay extending beyond mid-September 1999 does not prove that OSU would have refused time extensions upon the proper request for them under GC Section 6.4. Thus, appellee has not demonstrated that it was entitled to disregard its obligations under that part of the contract and to claim later, in its complaint, that OSU unreasonably withheld liquidated damages for delay in completing the project.

{¶ 41} "The cardinal purpose for judicial examination of any written instrument is to ascertain and give effect to the intent of the parties." *Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth.* (1997), 78 Ohio St.3d 353, 361, 678 N.E.2d 519. " 'The intent of the parties to a contract is presumed to reside in the language they chose to employ in the agreement.' " Id., quoting *Kelly v. Med. Life Ins. Co.* (1987), 31 Ohio St.3d 130, 31 OBR 289, 509 N.E.2d 411, paragraph one of the syllabus.

{¶ 42} Applying these basic principles to the language of GC Section 6.4, we conclude that appellee was obligated to request an extension of time for completion of the contract, within ten days following its formation of a belief that a

particular condition would entitle it to an extension. Had appellee done so, it could have relied upon the provisions of GC 6.2, which provides:

> If the Contractor is delayed at any time in the progress of the Work by any of the following causes, the Contract time *shall be extended* for such reasonable time which the Associate determines, in consultation with the Department and the Owner, has been caused by the delay in the Work:
>
> 6.2.1  Delay due to suspension of the Work for which the Contractor is not responsible; * * *
>
> 6.2.2  Neglect, delay or fault of any Contractor having a Contract for adjoining or contiguous Work; or
>
> 6.2.3  By any unforeseeable cause beyond the control and without the fault or negligence of the Contractor.

(Emphasis added.)

■ {¶ 43} The associate architect would then have had ten days from the receipt of appellee's request, to "evaluate the facts and extent of any delay to the Work, consult with the Department and the Owner about the request and respond in writing to the Contractor." In light of the foregoing provisions, it can hardly be said that any request for an extension of time would have been a vain act. Though the parties might still have ultimately disagreed as to the causes of specific delays, or as to the appropriate measure of additional time required to complete a given element of the construction schedule affected thereby, the contract clearly provided a mechanism to foster prompt notice of expected delays, as well as documented communication regarding any resolution sought or considered by any party. Having failed to comply with its obligations to engage in such communication, appellee cannot now complain that OSU assessed liquidated damages for delay, which it was clearly permitted to do in these circumstances.

{¶ 44} This is true notwithstanding the fact that, as the referee noted, OSU's equitable allocation of liquidated damages was based upon the design team's "gut feeling" as to the contractors' relative responsibility for the delays. This evidence does not overweigh the fact that the amount of liquidated damages to be assessed against D & M, as well as the mechanism D & M was required to follow to preserve its right to challenge the imposition of liquidated damages, were prescribed by the plain language of the parties' agreement.

{¶ 45} For the foregoing reasons, appellants' seventh assignment of error is sustained.

{¶ 46} In their ninth assignment of error, appellants argue that, assuming arguendo that D & M performed its obligations as lead contractor, the trial court erred in awarding D & M the full balance of the contract price.

{¶ 47} Appellants argue that even if OSU wrongfully removed D & M as lead contractor, D & M is not entitled to the balance of the original contract price because it did not prove its actual damages. To award the full balance of the contract price, appellants argue, fails to take into account the cost savings appellee realized as a result of not having to perform part of the contract. According to appellants, when the trial court failed to deduct this cost savings, it erroneously put appellee in a *better position* than it would have been in absent appellants' breach. In response, appellee argues, without citing any authority, that appellants had the burden of proving that D & M realized some cost savings as a result of having been removed as lead contractor.

{¶ 48} We find appellants' argument to be well taken. A plaintiff who prevails on a claim for breach of contract "is entitled only to recover damages for defendant's breach of contract. Such damages may include the further compensation plaintiff would have received under the contract if it had been performed, less the value to plaintiff of his being relieved of the obligation of completing performance." *Allen, Heaton & McDonald, Inc. v. Castle Farm Amusement Co.* (1949), 151 Ohio St. 522, 39 O.O. 330, 86 N.E.2d 782, paragraph one of the syllabus. "In such a case, plaintiff has the burden of alleging and proving not only (a) what he would have received under the contract from the performance so prevented, but also (b) what such performance would have cost him (or the value to him of relief therefrom). Unless he proves both of those facts, he cannot recover as damages the profits he would have earned from full performance of the contract." Id. at paragraph three of the syllabus.

{¶ 49} It is well established that judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, syllabus.

{¶ 50} D & M argues that the only evidence in the record that addresses the existence or nonexistence of cost savings to D & M following its ouster as lead contractor establishes that it realized no savings because it "was forbidden from reducing its administrative staffing coincident with Gilbane's assumption of Lead Contractor duties." It directs our attention to its own trial Exhibit 338, a copy of the July 2, 1999 letter from the associate architect to Fredelake in which D & M is relieved of its lead-contractor duties for numerous responsibilities. We perceive nothing in the text of this letter that demonstrates, or even supports the inference, that D & M realized no cost savings after July 2, 1999.

{¶ 51} D & M also directs our attention to testimony of Charles Edward Hamilton, a Senior Project Manager for OSU, that he attended the first progress

meeting held after D & M was relieved of its lead-contractor duties. Again, we fail to see how this testimony, or any other evidence, supports the trial court's award to appellee of the full balance of the contract price. Thus, it is clear that appellee did not meet its burden under *Allen, Heaton & McDonald.*

{¶ 52} The figure of $264,340 that OSU paid to Gilbane for its assumption and completion of the lead-contractor duties is not a reliable substitute for evidence of D & M's cost savings. The amount paid to Gilbane would include a portion of its home-office overhead plus a profit margin. Thus, the amount that OSU paid to Gilbane—the cost to the end user—does not equate to the amount of cost savings that would have been experienced by another contractor, in this case, D & M. Without evidence in the record to establish D & M's cost savings, pursuant to *Allen, Heaton & McDonald,* the contract balance award must be reversed. Accordingly, appellants' ninth assignment of error is sustained.

{¶ 53} In its tenth assignment of error, appellants argue that the trial court erred in ordering them to pay prejudgment interest at the rate of ten percent per annum when GC 9.2 specifies a particular method of calculating interest. Specifically, Paragraph 9.2.2.2 provides:

> Payments due and not paid to the Contractor within such thirty (30) day period shall bear interest from the date payment is due under the Contract Documents at the average of the prime rate established at the commercial banks in the city of over 100,000 population that is nearest to the Project, pursuant to Section 153.14, ORC.

{¶ 54} Additionally, appellants point out, Paragraph 9.2.3 provides that the owner may deduct any liquidated damages to which it is entitled from any application for payment. Appellants argue that because OSU deducted from D & M's pay applications the liquidated damages it felt it was owed, when the trial court ordered these sums returned, interest on these sums should have been calculated in accordance with GC 9.2. They contend that it was error for the trial court to impose an interest rate of ten percent per annum, which was the rate applicable only when the damages flow from the breach of a contract that itself does not specify an interest rate. See former R.C. 1343.03.

{¶ 55} In response, appellee points out that, pursuant to R.C. 2743.18, the state of Ohio must pay interest on judgments rendered against it "at the same rate as allowed between private parties to a suit." R.C. 2743.18(A)(1). Appellee also cites *Royal Elec. Constr. Corp. v. Ohio State Univ.* (1995), 73 Ohio St.3d 110, 652 N.E.2d 687, in which the Supreme Court of Ohio held:

> In a case involving breach of contract where liability is determined and damages are awarded against the state, the aggrieved party is entitled to prejudgment interest on the amount of damages found due by the Court of

Claims. The award of prejudgment interest is compensation to the plaintiff for the period of time between accrual of the claim and judgment, regardless of whether the judgment is based on a claim which was liquidated or unliquidated * * *.

Id. at syllabus.

{¶ 56} We are unable to find any authority that deals with the precise issue presented here; that is, whether deductions from contractor payments, which are taken to satisfy a liquidated damages assessment later judicially determined to be unwarranted, are subject to the contract's late-payment interest provision, or whether they are subject to the statutory prejudgment interest amount. We see some legitimacy in both positions. However, we think the better choice is to apply the statutory interest rate because a payment made following entry of a judgment awarding return of wrongfully assessed liquidated damages, rendered sometimes years after the fact, strains the definition of "late payment," even when the liquidated damages were originally assessed by deducting the amount from a contractor payment. Accordingly, we find no error in the trial court's award of prejudgment interest at the statutory rate. Appellants' tenth assignment of error is overruled.

{¶ 57} We now turn to appellee's cross-appeal. All three assignments of error advanced therein are related to appellee's recovery of delay damages, or cumulative-impact damages. Because our disposition of appellants' first assignment of error requires complete reversal of appellee's damages award in this regard, we find all three of appellee's assignments of error to be moot and decline to address them.

{¶ 58} In summary, appellants' first, seventh, and ninth assignments of error are sustained. Appellants' second, third, fourth, fifth, sixth, and eighth assignments of error are moot. Appellants' tenth assignment of error is overruled. Appellee's first, second, and third assignments of error are moot. The judgment of the Ohio Court of Claims is affirmed as to the reverse back-charge award of $264,340 (which was not assigned as error by appellants) and the court's assessment of prejudgment interest thereon at the rate of ten percent per annum. The judgment of the Ohio Court of Claims is reversed in all other respects, and this matter is remanded to that court with instructions to enter a new judgment consistent with this opinion.

Judgment affirmed in part
and reversed in part,
and cause remanded.

Petree, J., concurs.

Brown, P.J., concurs in part and dissents in part.

BROWN, Presiding Judge, concurring in part and dissenting in part.

{¶ 59} In addressing the first assignment of error, the majority finds that appellee is not entitled to delay damages because the *Spearin* doctrine, set forth in *United States v. Spearin* (1918), 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166, could not be applied based upon the record in this case, and, therefore, the remaining assignments regarding delay damages are rendered moot. The trier of fact found that "as a result of incomplete, inaccurate, and unconstructable plans and specifications, Dugan & Meyers suffered damages for which it has not been compensated." The trier of fact heard the testimony of Fredelake and several others regarding the effect of the numerous changes upon the general conditions. The referee found that the state failed to present evidence to refute the evidence of Dugan & Meyers ("D & M") on this issue. Based upon a review of the record and the referee's findings adopted by the trial court, I would overrule the assignments of error relating to delay damages and affirm the lower court on this issue.

{¶ 60} The majority's opinion next discusses appellants' seventh assignment of error regarding assessment of liquidated damages by the Ohio State University ("OSU"). I respectfully disagree with the majority's ruling and would overrule the seventh assignment of error, as I believe the trier of fact appropriately addressed the issue of liquidated damages finding that OSU did not objectively evaluate the project delays in assessing $325,500 in liquidated damages but, rather, based its assessment on a "gut feeling," as revealed by the testimony of Carol Benkert.

{¶ 61} In its ninth assignment of error, appellants argue that the trial court erred in awarding D & M the full balance of the contract price. In applying *Allen, Heaton & McDonald, Inc. v. Castle Farm Amusement Co.* (1949), 151 Ohio St. 522, 39 O.O. 330, 86 N.E.2d 782, the majority finds that D & M has not met its burden in showing entitlement to the full balance of the contract price. I would agree. However, there is no dispute that $602,745 is the contract balance that D & M would have received had it been permitted to complete the contract. Gilbane was compensated in the amount of $264,340, which includes costs D & M was not required to incur.

{¶ 62} As noted in the syllabus of *Allen,* a "plaintiff is entitled only to recover damages for defendant's breach of contract. Such damages may include the further compensation plaintiff would have received under the contract if it had been performed, less the value to plaintiff of his being relieved of the obligation of completing performance." Therefore, D & M is entitled to a portion of the contract price in the amount of $338,405 as damages for the breach of contract by appellants. Additionally, D & M continued as the prime contractor after having been replaced as lead contractor. Nevertheless, the amount of $338,405 repre-

sents the minimum profit appellants' breach prevented D & M from earning, since profit also would have been included in the $264,340 paid to Gilbane.

{¶ 63} Regarding the tenth assignment of error, I would concur with the majority in overruling this assignment of error.

{¶ 64} Therefore, I would affirm the judgment of the Court of Claims with a modification of the amount awarded on the balance of the contract.