DUGAN & MEYERS CONSTRUCTION CO., INC., APPELLANT, *v.* OHIO DEPARTMENT OF ADMINISTRATIVE SERVICES ET AL., APPELLEES.

[Cite as *Dugan & Meyers Constr. Co., Inc. v. Ohio Dept. of Adm. Servs.,* 113 Ohio St.3d 226, 2007-Ohio-1687.]

(No. 2005–1698—Submitted October 18, 2006—Decided April 25, 2007.)

MOYER, C.J.

{¶ 1} This case concerns a $20.9 million contract for construction of three buildings to be part of the Fisher College of Business of the Ohio State University. The parties to the contract are the appellees, Ohio Department of Administrative Services ("the department") and The Ohio State University ("OSU") (collectively, "the state"), and the appellant, Dugan & Meyers Construction Co., Inc. ("Dugan & Meyers").

The Contract

{¶ 2} In 1997, Dugan & Meyers submitted a successful competitive bid to serve as the lead contractor for the construction of three buildings to be part of the Fisher College of Business at OSU: an undergraduate building, a resource center, and an executive-education building. Dugan & Meyers and the department, which served as the authorized contracting agent for OSU, executed a written contract in which the department agreed to pay Dugan & Meyers $20,932,500 and Dugan & Meyers agreed to complete construction work according to plans and specifications prepared by the associate architect on the project, Karlsberger Companies. During construction the associate architect monitored construction and processed change orders under the terms of the contract.

{¶ 3} The contract provided that Dugan & Meyers was to complete the work "on or before 660 consecutive days, following the date set forth in the Notice to Proceed, unless an extension of time [was] granted by the Director [of the department] in accordance with the Contract Documents." The contract further provided that if Dugan & Meyers did not complete the work within the 660–day period, the department would be "entitled to retain or recover from [Dugan &

Meyers], as liquidated damages, and not as a penalty, the amount of $3,000 per day for each and every calendar day thereafter until such Work [was] completed and accepted."

{¶ 4} The contract included general conditions ("GCs"), including the following:

{¶ 5} "Article 6—Time

{¶ 6} "6.1 Time is of the essence to the Contract Documents and all obligations thereunder. By executing the Contract, the Contractor acknowledges that the time for Contract Completion and any specified milestone completion dates are reasonable * * *.

{¶ 7} " * * *

{¶ 8} "6.2 If the Contractor is delayed at any time in the progress of the Work by any of the following causes, the Contract time shall be extended for such reasonable time which the Associate [architect] determines, in consultation with the Department and the Owner, has been caused by the delay in the Work:

{¶ 9} "6.2.1 Delay due to suspension of the Work for which the Contractor is not responsible; * * *

{¶ 10} " * * *

{¶ 11} "6.2.3 By any unforeseeable cause beyond the control and without fault or negligence of the Contractor.

{¶ 12} "6.3 Any extension of time granted pursuant to paragraph GC 6.2 shall be the sole remedy which may be provided by the Department. In no event shall the Contractor be entitled to additional compensation or mitigation of Liquidated Damages for any delay listed in paragraph GC 6.2, including, without limitation, costs of acceleration, consequential damages, loss of efficiency, loss of productivity, lost opportunity costs, impact damages, lost profits or other similar remuneration."

{¶ 13} The contract also provided that the contractor's failure to request in writing an extension of time within ten days after the occurrence of a condition necessitating an extension of time "shall constitute a waiver by the Contractor of any claim for extension or for mitigation of Liquidated Damages."

{¶ 14} On August 15, 1997, the department sent a letter authorizing Dugan & Meyers to commence work "within one week from the date of [the] letter and to fully complete the work on or before 660 consecutive calendar days or by June 13, 1999." The completion dates for the three buildings were subsequently modified by agreement of the parties to June 11, 1999, for the resource center and to July 11, 1999, for the undergraduate building and executive-education building.

### Delays in Construction

{¶ 15} Construction progressed virtually on schedule during the first year. By June 1998, however, the project began to fall behind schedule. As summarized by the Court of Claims referee, "As the interior work progressed numerous omissions, inaccuracies, and conflicts in the design documents * * * were discovered that required the contractors, before proceeding with their work, to seek a determination by the associate as to what was intended or required." By February 1999 it was apparent that the project was unlikely to be completed in time to ensure completion of that portion of the project that was needed for fall 1999 classes. Dugan & Meyers did not make any written requests for extensions of time after January 1998.

{¶ 16} Attempts to bring the project back on schedule failed, and OSU[1] ultimately relieved Dugan & Meyers of its responsibilities as lead contractor, substituting the Gilbane Building Company ("Gilbane").[2] OSU discharged Dugan & Meyers for the stated reason that Dugan & Meyers "failed or neglected to prosecute the Work with the necessary diligence so as to complete the work by the applicable milestones and the time specified in the Contract." According to the referee's report, under Gilbane's direction, the undergraduate building was completed in time for fall classes in September 1999 and the last of the three buildings was completed on January 16, 2000, six months after the modified deadline.

{¶ 17} Dugan & Meyers sought payment from OSU for services rendered under the contract. In determining the amount due, OSU deducted the amount paid to Gilbane for completing the lead-contractor duties. OSU also assessed Dugan & Meyers liquidated damages based on 188 days of delay in completion. OSU determined the liquidated damages by apportioning responsibility for the 188 days of delay between three subcontractors and Dugan & Meyers and charged Dugan & Meyers for its contribution to the project delay.

### The Litigation

{¶ 18} Dugan & Meyers filed a complaint in the Court of Claims of Ohio seeking an award of nearly $3.4 million based on breach of contract or, alternatively, unjust enrichment. The complaint acknowledged that Dugan & Meyers began to have problems with the project, which led to delays, beginning in the second year of the project, but asserted that the delays were due in large part to the fact that the plans for the project provided by OSU were inaccurate and

---

1. The department assigned responsibility for administering the contract to OSU as a cost-saving measure.

2. Gilbane had previously served as construction manager of the project.

incomplete. The complaint claimed, in summary, that Dugan & Meyers had issued in excess of 700 requests for information, many of which produced no timely response; associate architect Karlsberger had issued over 250 field work orders and 85 architectural supplemental instructions directing Dugan & Meyers to perform work outside the contract; and Dugan & Meyers was "entitled to time extensions for delays and impacts outside of its control," which the state had refused to grant. The complaint concluded that the state had breached its duty to provide Dugan & Meyers with plans that were buildable, accurate, and complete, and had unreasonably rejected legitimate time-extension requests.

{¶ 19} The state denied liability and asserted a counterclaim against Dugan & Meyers for liquidated damages and for costs it incurred as the result of substituting Gilbane as lead contractor.

{¶ 20} After a 17–day trial, a Court of Claims referee [3] issued findings of fact and recommendations. He found that "the principal cause of the delay in completion of [the project] was the existence of an excessive number of errors, omissions and conflicts in the design documents furnished to bidders by the state and incorporated into [Dugan & Meyers's] contracts." He further observed that the "state offered no expert or lay testimony to rebut [Dugan & Meyers's] evidence that the design documents were incomplete and inaccurate and constituted the underlying cause of the delay in achieving project completion."

{¶ 21} The referee concluded that OSU had breached the contract by removing Dugan & Meyers as lead contractor. The referee also found that OSU was not entitled to charge Dugan & Meyers for payments OSU had made to Gilbane and that OSU could not invoke the liquidated-damages clause of the contract, because the state, rather than Dugan & Meyers, was the party principally responsible for the delay in completing the project.

{¶ 22} The referee recommended that Dugan & Meyers be awarded additional damages for the "cumulative impact" of the excessive number of design changes needed during construction. The referee relied on a legal doctrine commonly known as the *Spearin* Doctrine to state that a "contractor has a contractual right to expect complete, accurate and buildable plans and may recover its damages resulting from the owner's failure to meet the contractual obligation." He relied

---

3. R.C. 2743.03(C)(3) states: "When any dispute under division (B) of section 153.12 of the Revised Code is brought to the court of claims, upon request of either party to the dispute, the chief justice of the supreme court shall appoint a single referee or a panel of three referees. The referees need not be attorneys, but shall be persons knowledgeable about construction contract law, a member of the construction industry panel of the American arbitration association, or an individual or individuals deemed qualified by the chief justice to serve. * * * The referee or panel of referees shall submit its report, which shall include a recommendation and finding of fact, to the judge assigned to the case by the chief justice, within thirty days of the conclusion of the hearings."

on decisions of the federal General Services Administration Board of Contract Appeals in concluding that "as a direct and proximate result of the cumulative impact of multiple changes to the plans and specifications, for which the state is responsible, [Dugan & Meyers] incurred additional cost over and above its adjusted bid item for general conditions." The Court of Claims entered judgment for Dugan & Meyers in accord with the referee's recommendations.

{¶ 23} The court of appeals reversed in part the judgment of the Court of Claims. The court of appeals held that (1) an award for cumulative-impact damages has no basis in Ohio law and is contrary to the express provisions of the contract, (2) Dugan & Meyers was not excused from the contractual requirement that it request in writing an extension of the deadline or mitigation of liquidated damages, and (3) Dugan & Meyers had failed to provide competent evidence of actual damages incurred relating to its removal as lead contractor.

{¶ 24} We accepted jurisdiction over Dugan & Meyers's discretionary appeal.

Analysis

{¶ 25} Dugan & Meyers raises as its primary issue the question whether a construction-law doctrine known as the *Spearin* doctrine is recognized in Ohio, and if so, the parameters of the doctrine. Dugan & Meyers suggests that an owner of a competitively bid construction project impliedly warrants that the plans issued are buildable, accurate, and complete and that a contractor may recover damages if the owner breaches that implied warranty, resulting in delay or increased cost to complete the contract.

{¶ 26} As support for this proposition, Dugan & Meyers cites *United States v. Spearin* (1918), 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166. In *Spearin*, the United State Supreme Court recognized that when a contractor is "bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications." Id. at 136, 39 S.Ct. 59, 63 L.Ed. 166.

{¶ 27} *Spearin* involved the existence of a site condition that precluded completion of the construction project. Ohio courts have recognized that the "*Spearin* doctrine holds that, in cases involving government contracts, the government impliedly warrants the accuracy of its *affirmative indications regarding job site conditions*." (Emphasis added.) *Sherman R. Smoot Co. v. Ohio Dept. of Adm. Servs.* (2000), 136 Ohio App.3d 166, 176, 736 N.E.2d 69, citing *Cent. Ohio Joint Vocational School Dist. Bd. of Edn. v. Peterson Constr. Co.* (1998), 129 Ohio App.3d 58, 65, 716 N.E.2d 1210. In contrast, the case before us concerns the allocation of damages flowing from *delay* in completion of a construction project due to plan changes.

{¶ 28} Despite the interest in the *Spearin* Doctrine and the arguments of counsel for the various amici, we decline the opportunity to extend the *Spearin* Doctrine from job-site-conditions cases to cases involving delay due to plan changes.

{¶ 29} Moreover, the contract in this case included terms that addressed the contractor's remedy when changes were made to the plans. This court has long recognized that "where a contract is plain and unambiguous, it does not become ambiguous by reason of the fact that in its operation it will work a hardship upon one of the parties thereto and a corresponding advantage to the other, [and] that it is not the province of courts to relieve parties of improvident contracts." *Ohio Crane Co. v. Hicks* (1924), 110 Ohio St. 168, 172, 143 N.E. 388. In addition, "unless there is fraud or other unlawfulness involved, courts are powerless to save a competent person from the effects of his own voluntary agreement." *Ullmann v. May* (1947), 147 Ohio St. 468, 476, 34 O.O. 384, 72 N.E.2d 63.

{¶ 30} We have previously affirmed these principles in a case involving a competitively bid public construction contract. In *S & M Constructors, Inc. v. Columbus* (1982), 70 Ohio St.2d 69, 70, 24 O.O.3d 145, 434 N.E.2d 1349, the contractor agreed that it would make no claim against the city even if the conditions of the subsurface as reported to contractors before the bidding differed materially from actual subsurface conditions encountered during the project. We held that the "no claim" provision was unambiguous and was enforceable in the absence of a showing of fraud or bad faith on the part of the city. We observed that the *Spearin* Doctrine does not invalidate an express contractual provision: " 'Where one agrees to do, for a fixed sum, a thing possible to be performed, he will not be excused or become entitled to additional compensation, because unforeseen difficulties are encountered (Citations omitted).' " *S & M* at 75, 24 O.O.3d 145, 434 N.E.2d 1349, quoting *Spearin*, 248 U.S. at 136, 39 S.Ct. 59, 63 L.Ed. 166.

{¶ 31} The contract in the case at bar contained several relevant provisions, which were valid under Ohio law when the contract was signed. The parties agreed, "Time is of the essence to the Contract Documents and all obligations thereunder," and the contract provided a specific procedure to be followed in the event of project delay. The contract also contained a no-damages-for-delay clause, which provided that "extension of time granted pursuant to paragraph GC 6.2 shall be the sole remedy which may be provided by the Department" and that the Contractor shall not "be entitled to additional compensation or mitigation of Liquidated Damages for any delay listed in paragraph GC 6.2." The contract provided that the contractor's failure to request, in writing, an extension of time within ten days after the occurrence of a condition necessitating an extension of

time "shall constitute a waiver * * * of any claim for extension or for mitigation of Liquidated Damages."

{¶ 32} In 1998, after the parties in this case had entered into the contract at issue, the General Assembly declared no-damages-for-delay clauses void and unenforceable as against public policy "when the cause of the delay is a proximate result of the owner's act or failure to act." R.C. 4113.62(C)(1). The General Assembly also declared void and unenforceable any other contractual provision that "waives any other remedy for a construction contract when the cause of the delay is a proximate result of the owner's act or failure to act." Id.

{¶ 33} However, Section 3 of the enacting legislation states: "Nothing in section 4113.62 of the Revised Code, as enacted by this act, applies to or shall be construed as applying to any contracts, agreements, or understandings entered into before the effective date of this act." 147 Ohio Laws, Part IV, 7186, 7189. R.C. 4113.62(C)(1) was enacted and became effective in 1998, subsequent to the date of the contract at issue in this case. In 1997, when the appellees executed the contract with Dugan & Meyers, no-damages-for-delay clauses and provisions waiving remedies for delays caused by the owner were valid in Ohio.

{¶ 34} At the time the parties entered into the contract, Ohio followed the general rule followed by other jurisdictions concerning no-damages-for-delay clauses:

{¶ 35} "Provisions against the recovery of damages resulting from delay caused by public authorities are valid, and when applicable, preclude the contractor from recovering damages, although the courts are generally inclined to construe such provisions rather strictly. Thus, ordinarily, recovery for a delay in public construction work due to an act of the public authorities will be precluded by a clause against liability for delays, if the particular delay is one falling within the terms of such a clause." (Footnotes omitted.) 64 American Jurisprudence 2d (1965, Supp.2006), Public Works and Contracts, Section 170. This general rule can also be found in an annotation: "*[A]bsent an express agreement to the contrary,* a contractor is not liable for delay in the completion of a work attributable to his contractee's plans and specifications." (Emphasis added.) Annotation (1966), 6 A.L.R.3d 1394, Section 3b.

{¶ 36} Consistent with this general rule, we recognized in *Carrabine Constr. Co. v. Chrysler Realty Corp.* (1986), 25 Ohio St.3d 222, 25 OBR 283, 495 N.E.2d 952, that " 'no damages for delay' clauses which exculpate a contractee from liability for damages suffered by a contractor by reason of being delayed in the performance of its work have generally been accepted as valid under Ohio law subject to certain exceptions." (Citation omitted.) Id. at 228, 25 OBR 283, 495 N.E.2d 952. This court rejected the contractor's argument in *Carrabine* that the

cause of the delay (obtaining necessary zoning approvals) was not contemplated by the parties at the time the contract was executed.

{¶ 37} In the case at bar, even if the plans had required more changes than originally contemplated, the contract established a detailed procedure to be followed for all changes.[4] In order to hold in favor of Dugan & Meyers, we would need, first, to find that the state had implicitly warranted that its plans were buildable, accurate, and complete, and, second, to hold that the implied warranty prevails over express contractual provisions. To do so would contravene established precedent, which we will not do.

{¶ 38} Our decision is in accord with numerous decisions throughout the country. In *Ericksen v. Edmonds School Dist. No. 15, Snohomish Cty.* (1942), 13 Wash.2d 398, 125 P.2d 275, the court upheld a no-damages-for-delay clause and held a contractor responsible for liquidated damages for delay despite the existence of multiple errors and omissions in plans that had been supplied by the owner. The Supreme Court of Washington cited nearly 20 cases from multiple jurisdictions for the proposition that when a "contract expressly precludes the recovery of damages by the contractor for delay caused by the default of the owner, that provision will be given full effect." Id. at 409, 125 P.2d 275. The court observed that the clause was accompanied by an additional contractual stipulation that if "such hindrances or delays are occasioned by any act or omission on the part of the owner himself, additional time for the completion of the work will be allowed, provided always that the contractor shall have given notice in writing." Id. at 410, 125 P.2d 275. The court noted that the contractor had not given any written notice and that "wholly aside from [the contractor's] failure in that respect, *he was in any event precluded by the express terms of his contract from maintaining an action for damages resulting from hindrances and delays.*" (Emphasis added.) Id.

{¶ 39} An Illinois court considered a contractor's complaint seeking to recover for excessive labor costs, labor add-ons, increased overhead, interest on money borrowed, and other costs—costs similar to the "cumulative impact" damages sought herein by Dugan & Meyers. The court recognized that the contractor's claim was for damages it had sustained due to delay and held that the claim was precluded by a no-damages-for-delay clause in the contract. *Bates & Rogers Constr. Corp. v. N. Shore Sanitary Dist.* (1981), 92 Ill.App.3d 90, 47 Ill.Dec. 158, 414 N.E.2d 1274. Similarly, a federal court applying Ohio law found that Ohio courts have rejected cumulative-impact arguments and have held that when a contract has an express provision governing a dispute, that provision will be

---

4. Included in the plan documents is a document titled "Change Order Procedure and Pricing Guidelines." Seven pages of that document are dedicated to change-order procedures for various situations.

applied; the court will not rewrite the contract to achieve a more equitable result. *Ebenisterie Beaubois Ltee v. Marous Bros. Constr., Inc.* (Oct. 17, 2002), N.D.Ohio No. 02CV985, 2002 WL 32818011.

{¶ 40} Finally, we address several remaining arguments asserted by Dugan & Meyers. First, Dugan & Meyers argues that the court of appeals erred in its review of the manifest weight of the evidence by substituting its own findings of facts for those made by the Court of Claims. Specifically, Dugan & Meyers points to the referee's finding that "the principle cause of the delay in completion of [the project] was the existence of an excessive number of errors, omissions and conflicts in the design documents." However, as discussed above, the express language of the no-damage-for-delay clause renders irrelevant the cause of the delay. Moreover, the court of appeals correctly observed that "the record fails to demonstrate that [the problems with the plans] rendered the owner-furnished plans unbuildable or otherwise wholly inadequate to accomplish the purpose of the contract." 162 Ohio App.3d 491, 2005-Ohio-3810, 834 N.E.2d 1, ¶ 31. On the contrary, the Fisher College buildings were completed upon substitution of a new lead contractor.

{¶ 41} Next, we reject Dugan & Meyers's argument that it was excused from complying with the specific change-order procedure for requesting extensions because the state had actual notice of the need for changes to the deadline, and therefore any failure to comply with procedure was harmless error. The record lacks evidence of either an affirmative or implied waiver by the department or OSU of the change-order procedures contained in the contract. Dugan & Meyers has not convinced us that its failure to request extensions was harmless to OSU. To the contrary, Dugan & Meyers agreed that the contract language stated that failure to provide written notice "shall constitute a waiver by the Contractor of any claim for extension or for mitigation of Liquidated Damages." The court of appeals correctly concluded that Dugan & Meyers "has not demonstrated that it was entitled to disregard its obligations under that part of the contract and to claim * * * that OSU unreasonably withheld liquidated damages for delay in completing the project." 162 Ohio App.3d 491, 2005-Ohio-3810, 834 N.E.2d 1, ¶ 40.

{¶ 42} We also reject Dugan & Meyers's contention that OSU cannot enforce provisions of the contract requiring that Dugan & Meyers request extensions, because the department allegedly illegally assigned oversight of the contract to OSU contrary to its statutory responsibility under R.C. 123.01(A)(2). Dugan & Meyers does not cite authority for its assertion that contractual provisions are rendered void and unenforceable by illegal assignment.

{¶ 43} We therefore affirm the judgment of the court of appeals.

Judgment affirmed.

MOORE, LUNDBERG STRATTON, O'DONNELL and LANZINGER, JJ., concur.

O'CONNOR, J., concurs in judgment only.

PFEIFER, J., dissents.

CARLA D. MOORE, J., of the Ninth Appellate District, was assigned to sit for RESNICK, J., whose term ended on January 1, 2007.

CUPP, J., whose term began on January 2, 2007, did not participate in the consideration or decision of this case.

---

**PFEIFER, J., dissenting.**

{¶ 44} I dissent. This case calls for an application, not an extension, of *United States v. Spearin* (1918), 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166. As in all *Spearin* Doctrine cases, the fault in this case lies with the owner's plans. It requires no leap to find that the state implicitly warranted that its plans were buildable and that that warranty prevailed over general contract provisions. An owner's plans and specifications must be reliable for the contractual process to work. The majority seems to suggest that an owner need not be concerned with preparing accurate plans, since any deficiencies must be corrected by the contractor. As it turns out, the state could have saved a lot of money on blueprints and just submitted some sketches on the backs of a few cocktail napkins.

{¶ 45} In *Spearin*, the contract at issue required the contractor to relocate a section of sewer piping as part of the construction of a dry dock at the Brooklyn Navy Yard. The contract included specific provisions regarding the dimensions, material, and location for the new section of the sewer pipe. Id. at 133–134, 39 S.Ct. 59, 63 L.Ed. 166. The contract also required Spearin, the contractor, to examine the site and check the plans and specifications. Id. at 137, 39 S.Ct. 59, 63 L.Ed. 166. Neither the government nor Spearin was aware that the design of the existing sewer system caused a large amount of water to be diverted into the pipe that was to be replaced during periods of heavy water flow. Id. at 134, 39 S.Ct. 59, 63 L.Ed. 166. The government knew that the sewers in the area of the dry dock had occasionally overflowed in the years prior to the start of construction, but it never told Spearin. Id. Spearin complied with the contract requirements for the relocation of the sewer pipe, including the location, dimensions, and materials required by the government. Id.

{¶ 46} The relocated sewer line proved inadequate and burst in several places after a heavy rainfall, flooding the excavation for the dry dock. Id. Spearin refused to continue working on the project until the government rectified the sewer-line situation. Id. at 135, 39 S.Ct. 59, 63 L.Ed. 166. The government argued that the responsibility of remedying existing conditions rested with the

contractor. Id. Because Spearin refused to restore the sewer and continue work, the government annulled the contract. Id.

{¶ 47} *Spearin* sets forth the general rule of law that the contractor usually assumes the risk of work-site conditions: "Where one agrees to do, for a fixed sum, a thing possible to be performed, he will not be excused or become entitled to additional compensation, because unforeseen difficulties are encountered. * * * Thus one who undertakes to erect a structure upon a particular site, assumes ordinarily the risk of subsidence of the soil." *Spearin*, 248 U.S. at 136, 39 S.Ct. 59, 63 L.Ed. 166.

{¶ 48} But when the contractor's difficulties are a result of faulty specifications by the government, the burden changes: "But if the contractor is bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications." *Spearin*, 248 U.S. at 136, 39 S.Ct. 59, 63 L.Ed. 166. "[T]he insertion of the articles prescribing the character, dimensions and location of the sewer imported a warranty that if the specifications were complied with, the sewer would be adequate. This implied warranty is not overcome by the general clauses requiring the contractor to examine the site, to check up the plans, and to assume responsibility for the work until completion and acceptance. * * * The duty to check plans did not impose the obligation to pass upon their adequacy to accomplish the purpose in view." (Footnotes omitted.) Id.

{¶ 49} Under *Spearin*, construction changes caused by unexpected site conditions remain the responsibility of the contractor. But when the government's plans themselves are the cause of turmoil, things change: "Justice Brandeis recognized [in *Spearin*] that a contractor might well agree to assume risks relevant to design. By stating in his opinion that one who undertakes to erect a structure upon a particular site 'assumes ordinarily the risk of subsidence of the soil,' * * * Justice Brandeis recorded the obvious assumption that the contractor's responsibility for contract completion begins where the owner's detailed design ends. In essence, the Court recognized that the contractor's right to recovery for the owner's breach of its implied warranty of the adequacy of design was conditioned upon the contractor's reasonable reliance upon the owner's defective design in preparing its bid and in doing the work." 3 Bruner & O'Connor on Construction Law (2002), Section 9:78.

{¶ 50} The majority claims that in *S & M Constr., Inc. v. Columbus* (1982), 70 Ohio St.2d 69, 70, 24 O.O.3d 145, 434 N.E.2d 1349, this court "observed that the *Spearin* Doctrine does not invalidate an express contractual provision." Majority opinion at ¶ 30. No. In *S & M*, this court held that the case was distinguishable from *Spearin* and other cases "in which errors appeared in portions of the *contract*—particularly, in the plans, specifications, or blueprints." (Emphasis

sic.) *S & M* at 72, 24 O.O.3d 145, 434 N.E.2d 1349. And the court found that the construction delays were not a product of the owner's plans.

{¶ 51} *S & M* was a classic case of " 'Where one agrees to do, for a fixed sum, a thing possible to be performed, he will not be excused or become entitled to additional compensation, because unforeseen difficulties are encountered.' " *S & M* at 70, 24 O.O.3d 145, 434 N.E.2d 1349, quoting *Spearin*, 248 U.S. 132, 136, 39 S.Ct. 59, 63 L.Ed. 166.

{¶ 52} In *S & M*, construction complications arose out of conditions that were outside the contract. S & M successfully bid on a sewer-construction project for the city of Columbus. The city made subsurface reports available to all bidders upon request. The reports analyzed subsurface borings done on either side of the centerline of the project. *S & M*, 70 Ohio St.2d at 69, 24 O.O.3d 145, 434 N.E.2d 1349. But the city limited the prospective contractors' reliance on those reports. A provision of the contract at issue stated:

{¶ 53} "Said borings, test excavations, and other subsurface investigations, if any, are incomplete, are not a part of the contract documents, and are not warranted to show the actual subsurface conditions. The Contractor agrees that he will make no claim against the City or the Engineer if, in carrying out the work, he finds that the actual subsurface conditions encountered do not conform to those indicated by said borings, test excavations, and other subsurface investigations." Id. at 70, 24 O.O.3d 145, 434 N.E.2d 1349.

{¶ 54} During construction, S & M encountered subsurface conditions—inflows of water and concretions—that caused construction delays and additional costs. Id. at 69, 24 O.O.3d 145, 434 N.E.2d 1349. The trial court concluded that S & M had no right to rely on the subsurface reports as complete, as part of the contract documents, or as a warranty by the city of actual subsurface conditions.

{¶ 55} In *S & M*, the subsurface-conditions report was specifically excluded from the contract. The contractor could therefore not claim that the delays and additional expense were a product of the city's plans.

{¶ 56} In *Carrabine Constr. Co. v. Chrysler Realty Corp.* (1986), 25 Ohio St.3d 222, 25 OBR 283, 495 N.E.2d 952, the other Ohio case cited by the majority, the delay was caused by a need to have the construction site rezoned, which by contract was the responsibility of the contractor.

{¶ 57} Here, the principal cause of the delay, as determined by the finder of fact, was "an excessive number of errors, omissions and conflicts in the design documents furnished to bidders by the state and incorporated into [Dugan & Meyers's] contracts." There were no shifting sands, no acts of God, no surprising aquifers. As in *Spearin*, the designs themselves were the root of the problem. Here, the contract contained procedures for dealing with design problems, but

like the overburdened sewer pipe in *Spearin,* the procedure buckled under the torrent of required design changes.

{¶ 58} Certainly, dealing with minor design changes was anticipated in the contract. Dealing with unbuildable plans was not. *Spearin* does not apply to instances in which job interruptions are minor. The trier of fact in this case found that the design mistakes were not minor and that they were the cause of the delay. That is the essential question of *Spearin*—did the owner's plans cause the problem? Clearly in this case they did, and the trial court correctly applied *Spearin.*

------

Thompson Hine, L.L.P., Peter D. Welin, Daniel F. Edwards, and Michael W. Currie, for appellant.

Marc Dann, Attorney General, Douglas R. Cole, State Solicitor, and William C. Becker, Assistant Attorney General; and Vorys, Sater, Seymour & Pease, L.L.P., David S. Cupps, Joseph A. Brunetto, and William G. Porter II, for appellees.

Schottenstein, Zox & Dunn and Roger L. Sabo, urging reversal for amici curiae Associated General Contractors of Ohio and Ohio Contractors Association, Mechanical Contractors Association, and Cincinnati Sheet Metal Contractors Association.

Taft, Stettinius & Hollister, L.L.P., Fred A. Ungerman Jr., and Jill A. May, urging reversal for amici curiae Associated Builders and Contractors, Inc., and its Central Ohio, Ohio Valley, and Northern Ohio Chapters.

O'Rourke & Associates Co., L.P.A., Michael J. Warrell, and R. Russell O'Rourke, urging reversal for amicus curiae American Subcontractors Association.

Baker & Hostetler, L.L.P., Elliot S. Azoff, and Kelly M. King, urging reversal for amici curiae Construction Employers Association et al.

McFadden, Winner & Savage and James S. Savage, urging reversal for amicus curiae National Electrical Contractors' Association, Ohio Conference.

Frantz Ward, L.L.P., Ian H. Frank, and James T. Dixon, urging reversal for amicus curiae Surety Association of Ohio.

Shumaker, Loop & Kendrick, L.L.P., Robert A. Koenig, and Megan A.F. Bula, urging reversal for amici curiae Toledo Area Carpenter Employers Association, Inc. et al.

Graydon, Head & Ritchey, L.L.P., and J. Jeffrey Landen, urging reversal for amicus curiae Allied Construction Industries.

Cors & Bassett, L.L.C., Curtis L. Cornett, and David L. Barth, urging reversal for amici curiae Independent Electrical Contractors of Central Ohio, Greater Cincinnati, Northern Ohio, and Western Reserve Chapters.

Bricker & Eckler, L.L.P., Jack Rosati Jr., and Maureen P. Taylor, urging affirmance for amici curiae Ohio Municipal League, Ohio School Boards Association, Buckeye Association of School Administrators, and Ohio Association of School Business Officials.