**WAGNER–SMITH COMPANY, Plaintiff,**

v.

**RUSCILLI CONSTRUCTION COMPANY, INC., Defendant.**

2006-Ohio-5463.]

Court of Common Pleas of Ohio,
Franklin County.

No. 06CVH03–3751.

Decided Sept. 25, 2006.

Cooper & Elliott, L.L.C., Rex H. Elliott, Charles H. Cooper Jr., and John C. Camillus; Miller Law Firm, P.C., Richard W. Miller, and Scott H. Murphy, for plaintiff.

Thompson Hine L.L.P., Michael W. Currie, O. Judson Scheaf III, and Gabe J. Roehrenbeck, for defendant.

FRYE, Judge.

## 1. Introduction

{¶ 1} This dispute arose from a multimillion-dollar construction project at The Ohio State University ("the University"). The prime electrical contractor, Wagner–Smith Company, brought suit against the University's construction manager, Ruscilli Construction Company, Inc. for (1) tortious interference with its contract with the University and (2) tortious interference with its business relationship

with the University. Ruscilli seeks dismissal pursuant to Civ. R. 12(B)(6), arguing the complaint fails to state a claim upon which relief can be granted.

## 2. The factual record as pleaded

{¶ 2} The complaint, more extensive than most, appropriately focuses this dispute. Exhibit "A" to the complaint is a four-page excerpt from Section 4.2 of the General Conditions in the Project Manual, entitled "Responsibility and Authority of the Construction Manager." Pursuant to Civ.R. 10(C), this excerpt is incorporated into the complaint. The court is entitled to consider it in determining whether Wagner–Smith has stated a claim. *Keenan v. Adecco Emp. Servs., Inc.*, 3d Dist. No. 1–06–10, 2006-Ohio-3633, 2006 WL 1975871, at ¶ 8–9; *Park v. Acierno*, 160 Ohio App.3d 117, 2005-Ohio-1332, 826 N.E.2d 324, at ¶ 29.

{¶ 3} The University retained Ruscilli to act as its construction manager in connection with a Mechanical Engineering Building Replacement Project ("the Project"). In June 2004, following competitive bidding based in part on a bid package containing the Project Manual, Wagner–Smith entered into a $5.2 million contract with the University to perform the electrical work on the Project.

{¶ 4} The bid documents and resulting contract contemplated completion of work by Wagner–Smith in 707 days following issuance of a notice to proceed. That notice was given in July 2004. A "Construction Schedule" for the Project was to be prepared and kept current by Ruscilli in accordance with its independent obligations to the University. Ruscilli allegedly failed to prepare an accurate and reliable construction schedule that Wagner–Smith could use to plan its own work and coordinate it with other contractors. In addition, Ruscilli allegedly failed to monitor the progress of the Project for conformity to the schedule and, when difficulties arose, failed to initiate reasonable revisions to address them. To top it off, Ruscilli would not "acknowledge that it had failed to fulfill its contractual duties and that it was responsible for delaying the work on the Project," thereby preventing Wagner–Smith from doing what it independently agreed to do for the University. Indeed, it is said, Ruscilli "continued to bully Wagner–Smith and disrupt the work of Wagner–Smith under the threat of terminating Wagner–Smith from the Project."

{¶ 5} Lacking privity with Ruscilli, Wagner–Smith seeks to pursue tort claims. In response, Ruscilli primarily argues that (1) this action is not yet ripe because Wagner–Smith must first pursue a breach of contract action against the University, and (2) as the University's agent, Ruscilli could not, as a matter of law, interfere with the contract between Wagner–Smith and the University.

### 3. Analysis

{¶ 6} Two independent reasons justify granting Ruscilli's motion to dismiss. First, the economic-loss doctrine in Ohio blocks Wagner–Smith's tort claims. Second, even though Wagner–Smith was not obligated to sue the University before suing its construction manager, Ruscilli was privileged to act as it did under the rules governing tortious-interference claims. That privilege has not been overcome by superficial allegations of actual malice.

### A. Ruscilli owed no duty to Wagner–Smith

{¶ 7} Wagner–Smith has identified several instances in which courts elsewhere have entertained tortious-interference claims against construction managers: *Green Plumbing & Heating Co., Inc. v. Turner Constr. Co.* (C.A.6, 1984), 742 F.2d 965; *New York v. Aetna Cas. & Sur. Co.* (S.D.N.Y.1997), No. 96 Civ. 6890, 1997 WL 379704. Those decisions recognize such claims under Michigan and New York law, respectively. They are inapposite. Ohio law differs.

{¶ 8} The Ohio Supreme Court has examined tort claims in the context of construction contracting on several occasions. See, e.g., *Visintine & Co. v. New York, Chicago, & St. Louis RR. Co.* (1959), 169 Ohio St. 505, 9 O.O.2d 4, 160 N.E.2d 311; *Corporex Dev. & Constr. Mgt., Inc. v. Shook, Inc.*, 106 Ohio St.3d 412, 2005-Ohio-5409, 835 N.E.2d 701. *Visintine* addressed both contract and tort claims. The state undertook to eliminate a railroad crossing through the combined work of several railroads and a highway contractor, Visintine & Company. When the railroads did not meet their schedule, the schedule for Visintine & Company's work was disrupted. In addition to asserting rights as a third-party beneficiary under the railroads' separate contracts with the state, Visintine & Company asserted a tort claim against the railroads sounding in negligence. The Supreme Court upheld dismissal of Visintine & Company's tort claim, reasoning: "Tort is based on a duty owed by one party to another. The duty owed here by the defendants was to the state of Ohio, not to the plaintiff. The duty arising out of contract upon which plaintiff may rely in its first cause of action was that owed to it by the state. If defendants are liable to plaintiff it is due to a breach of the contracts they made with the state of Ohio and not to the violation of any duty owed directly to the plaintiff upon which a tort action may be based." *Visintine*, 169 Ohio St. at 510, 9 O.O.2d 4, 160 N.E.2d 311.

{¶ 9} The court most recently addressed the existence of a tort duty in a setting like this one in *Shook*, supra. Dublin Suites, Inc. ("DSI") was a building project owner that sought to recover purely economic damages in tort against a subcontractor, but premised the claim upon breach of contractually created duties. Id. at ¶ 1. The court rejected the tort claim because the only "duty"

argued to exist was grounded in a contract to which plaintiff was not a party. Id. at ¶ 12.

■ {¶ 10} *Shook* emphasized that prior decisions barred recovery in tort for purely economic loss. Id. at ¶ 6, citing *Chemtrol Adhesives, Inc. v. Am. Mfrs. Mut. Ins. Co.* (1989), 42 Ohio St.3d 40, 45, 537 N.E.2d 624, and *Floor Craft Floor Covering, Inc. v. Parma Community Gen. Hosp. Assn.* (1990), 54 Ohio St.3d 1, 3, 560 N.E.2d 206. The rule distilled from that line of cases "stems from the recognition of a balance between tort law, designed to redress losses suffered by breach of a duty imposed by law to protect societal interests, and contract law, which holds that 'parties to a commercial transaction should remain free to govern their own affairs.'" Id., quoting *Chemtrol,* 42 Ohio St.3d at 42, 537 N.E.2d 624. "'Tort law is not designed * * * to compensate parties for losses suffered as a result of a breach of duties assumed only by agreement.'" Id., quoting *Floor Craft,* 54 Ohio St.3d at 7, 560 N.E.2d 206. Accordingly, the court held that "[b]ecause the underlying duties are created by a contract to which DSI is not a party, no tort action lies in DSI's favor. Instead, DSI, the project owner, retains its right to file a breach-of-contract claim against Corporex, the contractor, for damages permitted under its contract, and Corporex may, in turn, recover any damages against Shook, the subcontractor, permitted by the subcontract. DSI may not, however, recover in tort when Shook has no duty in tort to protect DSI from purely economic damages. We will not adopt a rule that ignores basic tort law and thwarts the intentions of parties to a contract, who must be allowed to bargain freely to allocate the risks attendant to their undertaking, including the possibility of purely economic damages." (Citations omitted.) Id. at ¶ 11.

■ {¶ 11} Contractual duties running from Ruscilli to the University did not give rise to any legal duty owed Wagner–Smith. Accordingly, Wagner–Smith cannot seek economic damages in this case. Instead, if Ruscilli mismanaged the Project, Wagner–Smith may seek relief directly from the University for breach of contract premised upon obligations owed plaintiff by the University. The University's obligations can then be examined using the "four corners" of the promises made to Wagner–Smith. Practically speaking, the University may, in that event, elect to implead Ruscilli—but the University makes that choice, not Wagner–Smith.

### B. Ripeness

■ {¶ 12} Contrary to Ruscilli's argument, plaintiff was not required to pursue a cause of action for breach of contract against the University as a preferred or primary cause of action before seeking relief for tortious interference. "[A]n action in tort based upon malicious interference with a plaintiff's

contractual rights * * * poses a viable alternative to an action on the contract itself, and the mere existence of a plaintiff's inchoate cause of action against one party for breach of contract does not foreclose an action in tort against another party for all damages suffered by reason of the latter's inducement of such a breach." *Davison Fuel & Dock Co. v. Pickands Mather & Co.* (1977), 54 Ohio App.2d 177, 181–182, 8 O.O.3d 324, 376 N.E.2d 965. Thus, although Wagner–Smith might assert a breach-of-contract claim against the University premised upon Ruscilli's alleged mismanagement as the University's agent, the law does not demand that Wagner–Smith seek that remedy before suing Ruscilli.

{¶ 13} The mere fact that, as a general rule, a plaintiff may elect to pursue a tortious-interference claim in preference to a breach-of-contract claim does not, of course, mean Wagner–Smith stated a valid claim here. It did not.

## C. Privilege precludes the tortious-interference claims

{¶ 14} Leaving aside the absence of a duty, if one examines Wagner–Smith's complaint from the vantage point of tortious-interference law, a legal privilege precludes claims like these. A relatively recent decision of the Sixth Circuit summarized relevant features of Ohio law. *Super Sulky, Inc. v. U.S. Trotting Assn.* (C.A.6, 1999), 174 F.3d 733, explained:

 {¶ 15} "Ohio law recognizes causes of action for both tortious interference with a business relationship and tortious interference with contract rights. *See A & B–Abell Elevator Co., Inc. v. Columbus/Central Ohio Bldg. & Constr. Trades Council*, 73 Ohio St.3d 1, 651 N.E.2d 1283, 1294 (1995) They differ only in that the former tort does not require proof of a contractual relationship. *See id.* 'The torts of interference with business relationships and contract rights generally occur when a person, without a privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relation with another, or not to perform a contract with another.' *Id.*

" * * *

 "One of the key elements in a tortious interference claim is the question of whether a defendant's actions were privileged. *See A & B–Abell*, [73 Ohio St.3d at 14,] 651 N.E.2d at 1294. Ohio law imposes the burden of proving 'lack of privilege' or 'improper interference' on the plaintiff. *See Kenty v. Transamerica Premium Ins. Co.*, 72 Ohio St.3d 415, 650 N.E.2d 863, 866 (1995) * * *.

"In interpreting Ohio law, this court has applied the definition of 'improper interference' contained in § 767 of the Restatement (Second) of Torts. *See Kand Medical v. Freund Medical Products*, 963 F.2d 125, 128 (6th Cir.1992) (holding that under § 767, the conduct of a medical-devices distributor was privileged

under Ohio law because the conduct constituted lawful attempts to expand the defendant's business).

■ "*Kand* sets forth the following seven factors to be considered in deciding whether the alleged conduct was privileged, all of which are drawn from § 767:

> (1) the nature of the actor's conduct, (2) the actor's motive, (3) the interests of the party with whom the actor has interfered, (4) the interests sought to be advanced by the actor, (5) the social interests of protecting the freedom of contracting and the interference with such, (6) the proximity or remoteness of the actor's conduct to the interference, and (7) the relations between the parties."

*Kand,* 963 F.2d at 128. The nature of the actor's conduct is the chief factor that the court should consider. *See* RESTATEMENT (SECOND) OF TORTS § 767 cmt. c (1977)." *Super Sulky,* 174 F.3d at 741–742.

{¶ 16} Although *Super Sulky* observed that the chief factor to be "strongly considered" is the first, all seven factors identified in the Restatement are to be balanced. Id. at 743. A more recent (although unpublished) decision under Ohio law by the Sixth Circuit emphasized the "dispositive" importance of the seventh factor in cases in which contracts governing a business relationship "expressly permitted" the defendant's conduct. *Franklin Tractor Sales v. New Holland N. Am., Inc.* (C.A.6, 2004), 106 Fed.Appx. 342, 346.

{¶ 17} *Fred Siegel Co., L.P.A. v. Arter & Hadden* (1999), 85 Ohio St.3d 171, 707 N.E.2d 853, confirmed that a "lack of justification" (as defined in *Kenty,* 72 Ohio St.3d 415, 650 N.E.2d 863) means "the defendant's interference with another's contract was improper." "Improper" conduct, in turn, was held to be subject to determination under Restatement of the Law 2d, Torts (1979), Section 767, noted above. Id., paragraphs two and three of the syllabus.

{¶ 18} Whether Wagner–Smith has alleged a viable claim for Civ.R. 12(B)(6) purposes turns, in part, upon whether allegations about the nature of Ruscilli's actions reasonably support a conclusion that defendant acted out of a clearly "improper" motive, considered in the context of explicit obligations owed the University.

{¶ 19} In considering the nature of the alleged misconduct by this construction manager, the court takes judicial notice of the fact that projects undertaken by state government (and subordinate entities like the University) often involve large, technically challenging public works. Normally, as apparently was the situation here, detailed contract documents are prepared in an effort to sensibly manage such projects and allocate risks and responsibilities in advance. Beyond the contracting documents, specifications and architectural drawings normally are intended to guide completion of the work itself. Appreciating all the documenta-

tion that surrounds any large project lends additional context to the claims against Ruscilli. Beyond that, large projects demand blending the work of a design team of architects and engineers, the owner, a construction manager (hired by the owner), prime contractors (retained using competitive bidding or some other selection processes), and one or more layers of subcontractors subordinate to those prime contractors. Not infrequently, one of the most challenging parts of a large project proves to be coordination of work among all those independent participants.

{¶ 20} Successful management of a large construction project sometimes also demands an understanding beyond that gained from the specific contract language and the specifications. Various common law rules have been developed to overlay customary construction contract provisions, to further guide management of such work. For instance, normally a project owner impliedly warrants the adequacy of plans and specifications to the contractors. See *Dugan & Meyers Constr. Co., Inc. v. Ohio Dept. of Adm. Servs.*, 162 Ohio App.3d 491, 2005-Ohio-3810, 834 N.E.2d 1, at ¶ 26–34. Ordinarily, an owner must also make the land upon which a project will be built available in a timely fashion so that the work can be done, must not interfere with the progress of the work, must take action promptly on plan approvals or other choices contemplated, and has a responsibility to assure that everyone contracted to perform work that is interrelated with the work of others will perform in an appropriate, timely fashion. See *J.A. Jones Constr. Co. v. Dover* (Del.Super.1977), 372 A.2d 540, 546–547, and cases cited. Contractual provisions obligating an owner to provide a site on which work may be performed without delay or hindrance, and obligating those on-site to cooperate reasonably in order that the job may be sequenced and completed as scheduled have been commonplace for decades. See *Visintine*, 169 Ohio St. at 508–510, 160 N.E.2d 311.

{¶ 21} The allegations in this complaint, including portions of the General Conditions presently before the court, document that just Wagner–Smith's portion of the Project was expected to require nearly two years to complete and have a value in excess of five million dollars. Although the overall scope of the Mechanical Engineering Building Replacement Project has not been alleged, when just the electrical work had that scope, the entire Project must have been many times larger. To guide that anticipated work, therefore, Section 4.2.4 of the General Conditions provided that "[t]he Construction Manager shall monitor the progress of the Work * * * and shall initiate revisions of the Construction Schedule as required by the Contract Documents." Section 4.3.5 set out that the Construction Manager was to provide monthly progress reports on the Project, together with recommendations for adjusting the schedule to meet necessary milestone completion dates. If the critical path was not being met, the Construc-

tion Manager was to submit a time recovery plan offering remedies such as "increasing the Contractor's workforce in such quantities as will eliminate the backlog of Work."

■ {¶ 22} Ruscilli accepted broad responsibility for the Project. By doing so, it obligated itself to fully understand the entire project and manage many participants. The construction manager necessarily had legitimate justification to be involved in scheduling and other matters that directly implicated Wagner–Smith. Based upon the nature of the Project and the relationships between the parties, the factors identified as important in Section 767 of the Restatement lead to the conclusion that the construction manager enjoyed a qualified privilege relative to tortious-interference claims.

■ {¶ 23} That does not end the inquiry. Plaintiff cites *A & B–Abell Elevator Co.*, 73 Ohio St.3d at 11–12, 651 N.E.2d 1283, for the proposition that a qualified privilege can be overcome by "actual malice." The decision made clear, however, that " '[m]ere negligence is not enough to establish actual malice.' " Id. at 13, 651 N.E.2d 1283. Thus, Wagner–Smith's claims must be closely examined to determine whether they can fairly be read to allege that Ruscilli's conduct was malicious, rather than merely negligent. Superficial, conclusory allegations included as an afterthought or allegations that plainly are illogical or inconsistent with more detailed factual allegations in the complaint are insufficient to withstand a motion to dismiss. *Silverman v. Roetzel & Andress, L.P.A.*, 10th Dist. App. No. 06AP–455, 2006-Ohio-4785, 2006 WL 2627554, at ¶ 6. Wagner–Smith cannot escape the import of the detailed allegations in its complaint, including portions of the General Conditions attached as Exhibit A, merely by adding a statement that Ruscilli acted out of "actual malice."

■ {¶ 24} In most respects, Ruscilli's actions could not be found to have been malicious, or intended solely to harm Wagner–Smith. For example, paragraphs 15–18 of the complaint (and the many subparagraphs within them) plead Ruscilli's failure to fulfill its contractual obligations. A "failure" to manage something invokes the idea of ineffectiveness or neglect rather than intentional wrongdoing.

{¶ 25} It is undisputed that when scheduling or other difficulties arose, Ruscilli was obligated to seek remedies. Seeking to solve complex problems encountered on a large building project that obviously cannot all be predicted in advance may well have required "blaming" one or more of the contractors, including Wagner–Smith. That fact standing alone could not constitute malicious misconduct sufficient to allow these tortious-interference claims to proceed. Presumably seeking to assert that truly wrongful conduct actually existed, paragraphs 19 and 20 of the complaint go somewhat further to allege:

19. Rather than acknowledge that it had failed to fulfill its contractual duties and that it was responsible for delaying the work on the Project and for preventing the contractors, including Wagner–Smith, from performing their work in the manner that they had planned to perform their work when they bid the Project, Ruscilli developed and implemented a scheme to conceal and cover-up its failures and in an attempt to defeat the claims of Wagner–Smith for additional compensation and commensurate extension of time.

20. As part of its scheme, Ruscilli fabricated a story that Wagner–Smith was behind schedule, when i[n] fact it was ahead of schedule, in order to blame Wagner–Smith for the problems on the Project that were caused by Ruscilli's failure to fulfill its contractual duties.

{¶ 26} The benefit of all reasonable inferences must be given to Wagner–Smith in deciding this Rule 12(B)(6) motion. Ruscilli is claimed to have been involved in concealing and covering up its own failures, and it is said that as "part of its scheme" to do so, Ruscilli blamed Wagner–Smith. Yet even that conveys a mixed message. Most predicate acts blamed upon Ruscilli are said to have been negligent "failures." Many separate statements in the complaint identify specific instances in which Ruscilli simply neglected to do successfully what its contract with the University required, or else did not do what Wagner–Smith wanted. In the latter category, Wagner–Smith says that it had asked for construction schedules and updates in an electronic format "required by the Contract Documents," but for months, Ruscilli "failed ... to provide" them in that format. Failing to do something well or as requested is not malicious behavior under Ohio law.

{¶ 27} Inherent in the concept of actual malice is the notion that a wrongful act has been done without any plausible legal justification. Yet the complaint by Wagner–Smith reflects that most conduct by Ruscilli had a sensible purpose. Merely adding conclusory statements that such acts were intended to harm Wagner–Smith is not enough. A recent decision setting aside an award of punitive damages explains the logic of focusing upon Ruscilli's own interests in evaluating whether actual malice can be said to have existed. Landowners nearly lost their property when their mortgage company failed to pay their real estate taxes. They sued and obtained a jury verdict for punitive damages, premised upon Illinois law that demanded malice or an evil motive, or reckless indifference to the rights of others as a predicate for such punishment. The trial court found reckless indifference by the lender, but the Seventh Circuit vacated the punitive damages award because it simply was not sensible. In most respects, the interests of the property owners and their lender were aligned. "Norwest had given the Parkses a mortgage on their property, secured by the property itself. If the Parkses were to lose their house * * * Norwest would lose its security.

Any reckless indifference Norwest exhibited towards the Parkses would have been equally detrimental to its own ability to rely on the property as security for the repayment of the mortgage." *Parks v. Wells Fargo Home Mtge., Inc.* (C.A.7, 2005), 398 F.3d 937, 942. See, also, *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.* (1986), 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 ("It follows from these settled principles that if the factual context renders respondents' claim implausible—if the claim is one that simply makes no economic sense— respondents must come forward with more persuasive evidence to support their claim than would otherwise be necessary"). The same logic applies here. A construction manager's repeated failings—even if blamed after the fact on another contractor—cannot sensibly be understood to reflect "actual malice" without some explanation of why there was malice. If Ruscilli acted in the ways described in the complaint out of actual malice toward Wagner–Smith, necessarily that would mean that Ruscilli intentionally failed to manage, to the detriment of its own business interests and its own reputation in the construction industry. That is illogical. Superficial allegations of "actual malice" in this context cannot be blindly accepted when they lead to an irrational explanation of what occurred.

{¶ 28} In examining this case, it also merits mention that under Ohio law, an agent cannot be liable for tortious interference unless that agent's actions "benefited [itself] solely in a personal capacity." *Miller v. Wikel Mfg. Co.* (1989), 46 Ohio St.3d 76, 79, 545 N.E.2d 76; see, also, *Contemporary Villages, Inc. v. Hedge* (S.D.Ohio, 2006), Case No. 2:05–cv–170, 2006 WL 1697634. In *Miller,* the plaintiff alleged breach of an oral distributorship contract for driveway sealer by Wikel Manufacturing plus a tortious-interference claim against Wikel's president and majority shareholder. The Supreme Court rejected the separate tort claim. So long as a corporate officer acts, at least in part, for the principal and not solely for himself, he faces no personal liability for tortious interference. Id. at 80, 545 N.E.2d 76. Similarly, *Hedge* addressed such a claim premised upon defendant's advice solicited by his own mother. He advised her to decline plaintiff's offer to purchase property. The district court held that a mixed motive was not enough even though there was the potential inference of mixed motives on the defendant's part in advising his mother against making the sale. That rule of law also guides this court's analysis of these claims. Nowhere has it been suggested that Ruscilli acted *solely* for its own benefit. As discussed above, the only sensible inference drawn from this complaint is that construction was managed—perhaps ineffectively—but with an eye toward the University's interests rather than solely out of malice toward Wagner–Smith.

{¶ 29} A construction manager is obligated to act even if contractors are displeased. That is to say, Ruscilli was not some officious intermeddler. It had a legitimate and core role to fulfill on the Project. That role was known to

Wagner–Smith from the bidding package before it accepted the job. Ruscilli ultimately performed its duties imperfectly, according to the complaint. Nevertheless, its acts can only be understood, in virtually all respects, as proper for a construction manager to undertake within the framework of authority conveyed by the University. While it is alleged that after the fact Ruscilli blamed its own missteps on Wagner–Smith, that alone does not suffice to show actual malice. Balancing all of the circumstances, the court finds that Ruscilli was privileged to attempt to schedule and manage this Project even if it did so ineptly, and Wagner–Smith's superficial allegations do not overcome the privilege.

{¶ 30} The motion to dismiss is granted. The court is separately entering a judgment dismissing the complaint at plaintiff's costs.

Judgment accordingly.