HENKEL

v.

ASCHINGER et al.

SPRUILL et al.

v.

ASCHINGER et al.

WEISER REVOCABLE TRUST

v.

BAIR et al.

2012-Ohio-423.]

Court of Common Pleas of Ohio,
Franklin County.

Nos. 11CVH–11–14,234, 11CVH–11–14,256 and 11CVH–11–14,414.

Decided Jan. 11, 2012.

6

8

Law Offices of John C. Camillus, L.L.C., and John C. Camillus; Brodsy & Smith L.L.C., Evan J. Smith, and Marc L. Ackerman; The Briscoe Law Firm, P.L.L.C., and Willie Briscoe; and Levi & Korinsky, L.L.P., and Donald J. Enright, for plaintiffs.

Ice Miller, L.L.P., John C. McDonald, and Matthew L. Fornshell, for Individual defendants and nominal defendant Pinnacle Data Systems, Inc.

Squire, Sanders, & Dempsey, L.L.P., David W. Alexander, and Joseph P. Rodgers, for defendants Avnet, Inc., and Air Acquisition Corp.

FRYE, Judge.

## 1. *Introduction*

{¶ 1} Prompted by the announcement of a proposed corporate merger, three cases (now consolidated) were filed by four shareholders of Pinnacle Data Systems, Inc. ("PDSi"). Under a proposal unanimously endorsed by PDSi's board of directors, holders of PDSi common shares would receive $2.40 per share in an all-cash merger with a newly created subsidiary of Avnet, Inc., a Fortune 500 company. The proposed transaction has been valued at roughly $22 million.

{¶ 2} Plaintiffs challenge the merger as derivative plaintiffs under Civ.R. 23.1. They also assert direct claims on behalf of themselves and a putative Civ.R. 23 class of shareholders. Primarily, they seek injunctive relief to stop the proposed acquisition and beyond that hope to "obtain a [new] transaction that is in the best interests of Pinnacle's shareholders." The focus of the cases is the adequacy of the proposed price of $2.40 per share offered by Avnet.

{¶ 3} No shareholder vote approving or rejecting the merger has occurred, but a special meeting of PDSi shareholders has been noticed for later this month. Because PDSi is publicly traded, shareholder votes are being solicited using a

proxy statement filed (initially as a nearly complete draft and since in final form) with the Securities and Exchange Commission ("SEC"). The proxy includes a complete copy of a fairness opinion completed for PDSi's board by outside valuation consultant GBQ Consulting, L.L.C. ("GBQ").

{¶ 4} Claiming that material omissions and misstatements exist in the proxy statement and that the board's reliance upon GBQ's fairness opinion demands scrutiny, plaintiffs sued all six members of PDSi's board. Five are not employees, but the sixth board member is PDSi's president, chief executive officer, and a potential recipient of benefits under a so-called golden-parachute severance agreement. In addition, plaintiffs sued Avnet and its merger subsidiary. Plaintiffs claim that Avnet knowingly aided and abetted breaches of fiduciary duty by PDSi's board and took affirmative steps in the acquisition contract to improperly discourage other potential bidders.

{¶ 5} In seeking dismissal, defendants argue that no individual cause of action is presented because plaintiffs assert only a common injury—that the price offered by Avnet is too low—with the result that the only legal remedies potentially available are through a derivative action indirectly benefitting all PDSi shareholders or under Ohio's "dissenting shareholders' rights" statute for anyone voting against the merger. R.C. 1701.85. Absent standing to sue for some individual-focused claim specifically affecting one or more individual plaintiffs, of course, a Civ.R. 23 class action cannot be certified. Defendants next argue that a derivative claim has not been properly brought in compliance with Civ.R. 23.1. Everyone acknowledges that no demand was made on PDSi's board to address the problems about which plaintiffs sued. According to defendants, plaintiffs' allegation of the futility of such a demand is inadequate, and beyond that none of the plaintiffs properly verified their claims. Avnet independently seeks dismissal and primarily argues that it simply owed no legal duty to PDSi shareholders to pay them a higher share price or to proceed on business terms less favorable to itself.

## 2. *Procedural and Factual Background*

### A. The Consolidated Complaint and the Proxy Statements

{¶ 6} As originally filed, each case had its own individual complaint. The three complaints were all filed before PDSi's draft proxy statement (required by Section 14(a) of the Securities Exchange Act of 1934) became available. It was publicly filed with the SEC on Friday November 25, 2011. The final proxy statement was filed at the SEC three weeks later, supplying last-minute details.

{¶ 7} Following consolidation of these cases and a conference with counsel, the court ordered that a single, consolidated complaint be filed covering all three

cases. That occurred on December 9. Subsequently, complete copies of the preliminary and final versions of the proxy statement were filed as part of the record in these cases.

{¶ 8} Ordinarily, in ruling on a motion to dismiss, a court may not consider matters outside the complaint. However, exceptions to this rule permit the court to consider PDSi's proxy statements. Plaintiffs' consolidated complaint specifically referred to the preliminary proxy statement. Defense counsel responded by referring to it repeatedly in their motions to dismiss. Both versions of the proxy statement are publicly filed at the SEC as well as at this court, and at oral argument both sides conceded their authenticity. " '[D]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim.' *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir.1993)." *Nieman v. NLO, Inc.*, 108 F.3d 1546, 1555 (6th Cir.1997). Moreover, in deciding a Civ.R. 12(B)(6) motion, it has been recognized that " 'matters of public record * * * [and] items appearing in the record of the case * * * also may be taken into account'." *Id.* at 1554, quoting Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure, Section 1357 (2d Ed.1990).

{¶ 9} Although Ohio remains a notice-pleading jurisdiction, the Franklin County Court of Appeals has recognized that "unsupported conclusions in a complaint are not considered admitted and are not sufficient to withstand a motion to dismiss." *Ferron v. Fifth Third Bank*, 10th Dist. No. 08AP–473, 2008-Ohio-6967, 2008 WL 5423555, at ¶ 12. "Superficial, conclusory allegations included as an afterthought or allegations that plainly are illogical or inconsistent with more detailed factual allegations in the complaint are insufficient to withstand a motion to dismiss. *Silverman v. Roetzel & Andress, L.P.A.*, 168 Ohio App.3d 715, 2006-Ohio-4785, 861 N.E.2d 834, at ¶ 6 (10th Dist.)." *Wagner–Smith Co. v. Ruscilli Constr. Co.*, 139 Ohio Misc.2d 101, 2006-Ohio-5463, 861 N.E.2d 612, at ¶ 23 (Franklin C.P.). Thus, the allegations in the consolidated complaint are appropriately considered against the generally much more detailed statements about PDSi and the proposed merger set out in the proxy statements.

B. Pretrial Discovery

{¶ 10} Upon filing suit, the plaintiffs demanded discovery. Following a conference with counsel, the court limited the scope of initial discovery somewhat until defendants' motions to dismiss could be briefed and argued. Nevertheless, it is important to recognize that in drafting their pleading, the plaintiffs had access to a significant amount of information about PDSi, the proposed merger, and the process that led PDSi's board's to unanimously recommend it to shareholders at $2.40 per share.

{¶ 11} Plaintiffs are dealing with public companies on both sides of the proposed merger. Thus, their access to information was relatively broad through corporate press releases and the EDGAR online system (which makes documents filed with the SEC readily available). Plaintiffs have had access to both the draft and final versions of the proxy statement, which included GBQ's fairness opinion, though not its work papers. Beyond that, the court ordered that a substantial volume of readily available PDSi documents be provided while the motions to dismiss were being briefed. Within five weeks after the suits were first filed, therefore, PDSi produced an electronic library of material accumulated a few months earlier for Avnet's due-diligence process. That collection, said to be 1.8 gigabytes in size, was estimated to comprise 80 percent or more of the documents that plaintiffs initially sought in discovery. As discussed below, despite the availability of such a large amount of potentially relevant material, the consolidated complaint remains remarkably generic.

## C.  The Parties

{¶ 12} PDSi is an Ohio corporation. Its shares are listed on the New York Stock Exchange Amex. They were traded on the last day prior to announcement of this proposed merger at $1.14 per share. Although PDSi's principal office is in Groveport, Ohio, it is a global provider of electronics repair and reverse logistics services, integrated computing services, and embedded computing products and design services for computing, telecom, defense/aerospace, medical, and other markets.

{¶ 13} Avnet, Inc., is a Fortune 500 company traded on the New York Stock Exchange. Avnet is said by plaintiffs to be one of the largest distributors of electronic components, computer products, and embedded technology service in more than 70 countries worldwide. To accomplish the proposed merger, Avnet, Inc., created a so-called merger sub, which is an Ohio corporation named AIR Acquisition Corp.

{¶ 14} Individual defendants in these cases include five nonemployee directors: Messrs. Aschinger, Brussell, Cathey, O'Leary, and Roberts. Also sued is John Bair, president, chief executive officer, and a director.

## D.  The Information in the Proxy Statement

{¶ 15} The final proxy statement is 66 pages long. It includes appendices (containing the fairness opinion of GBQ, a copy of R.C. 1701.85 spelling out dissenting shareholders' rights, and the merger agreement with Avnet) that nearly double its length.

{¶ 16} A good deal of information was summarized at the outset of the proxy statement for shareholders unwilling to wade through the detail provided in the

balance of the document. As with most documents filed at the SEC or used with publicly traded securities, there is much legalese. Yet in remarkably plain English, the proxy sets out the "Background of the Merger," beginning with the "severe global economic downturn that began in late 2008." It offers quite specific information on the negotiations with Avnet and even how particular features of the final agreement were reached. Immediately afterward, the proxy offers the board's "Reasons for the Merger" including detailed insider information on PDSi. That narrative candidly concedes the existence of negative factors in PDSi's future, such as its "inability to continue cost-cutting measures in a manner that would continue to benefit the Company's growth and profitability." The significant premium to shareholders that Avnet's $2.40 offer represents is also discussed in some detail, against the backdrop of other prices at which PDSi shares have traded in recent years.

E. Plaintiffs' Claims

{¶ 17} The consolidated complaint alleges that the proxy omits material information with respect to the events leading up to the merger agreement. For instance, it is said that there is no disclosure of whether PDSi received any indication of interest in a merger from other businesses contacted about investing additional capital in PDSi, during the summer of 2009; that not enough information is included about discussions held with another potential acquirer in early 2010; that there is not enough disclosed about why those exploratory conversations were abandoned; that not enough is said about early feelers between PDSi and Avnet between March and May 2011; that there is no disclosure of how PDSi's board settled on a share-price demand of $3.70 per share in late June 2011 discussions with Avnet, no explanation why the board entered into exclusivity contracts with Avnet between June and December 2011, and not enough about the information GBQ provided to the board between September and early November 2011 in connection with work on the fairness opinion. Additionally, the proxy is said to be materially deficient in regard to factual assumptions that GBQ used to perform its analysis, such as how the "market equity size premium," "cost of debt," and "cost of equity" were derived.

{¶ 18} Plaintiffs also complain about terms in the merger agreement. For instance, under some circumstances PDSi might be required to pay up to $1 million to Avnet if the proposed merger is terminated and in addition reimburse out-of-pocket legal fees and expenses incurred by Avnet. Although paragraph 41 of the consolidated complaint says that this is a one-way breakup fee without any reciprocal shift of expenses if Avnet instead walks away before closing, it appeared to be agreed by all counsel at oral argument that there is a reciprocal termination provision protecting PDSi.

{¶ 19} Plaintiffs also complain that the merger agreement contains a strict "no shop" provision restricting Pinnacle from considering alternative acquisition proposals, which "reduces the possibility of a topping offer from an unsolicited purchaser." As a result, "the Company's true value is compromised," and the proposed transaction is "the product of the Board's breaches of fiduciary duty, aided and abetted by Avnet, Pinnacle and the Merger Sub."

### 3. *The Distinction Between the Two Types of Claims*

{¶ 20} Plaintiffs assert both a direct action, for which they seek class-action status under Civ.R. 23, and a shareholder derivative action under Civ.R. 23.1. The leading national treatise has summarized the difference. "A derivative action is a suit brought by one or more shareholders to enforce a right of action belonging to the corporation, which it could have asserted, but did not. Where a corporation is harmed by alleged wrongdoing and the shareholders are indirectly injured, the claim is derivative in nature. It is harm to the corporation that determines if a controversy exists, not damage to the shareholders. Justice Robert H. Jackson described the derivative action as 'an invention of equity to supply the want of an adequate remedy to redress breaches of fiduciary duty by corporate managers.' The relief to be granted to the corporation through the named plaintiff, its representative, must be the same as if the corporation, itself, had brought the action." (Footnotes omitted.) 2–18 *Liability of Corporate Officers and Directors*, Section 18.01 (Matthew Bender & Co. 2011) at [3], Derivative Actions. "Although there are gray areas between derivative actions and suits brought by shareholders for their own benefit, diminution in the value of stock resulting from a wrong to the corporation is ordinarily a derivative claim and not a direct or class claim." *Id.*

{¶ 21} Ohio uses the same approach. "A plaintiff-shareholder does not have an independent cause of action where there is no showing that he has been injured in any capacity other than in common with all other shareholders as a consequence of the wrongful actions of a third party directed towards the corporation." *Adair v. Wozniak*, 23 Ohio St.3d 174, 492 N.E.2d 426 (1986), syllabus. That rule was later applied in *Weston v. Weston Paper & Mfg. Co.*, 74 Ohio St.3d 377, 379, 658 N.E.2d 1058 (1996). Justice Wright, author of both decisions, wrote for the court in *Weston* that "[i]f any injuries occurred, they occurred to all the other shareholders alike. That is precisely the situation in which derivative actions are required." *Id.*

{¶ 22} Plaintiffs' consolidated complaint says that the proposed merger "does not adequately value Pinnacle" or more indirectly gets to the same conclusion with other allegations. For instance, plaintiffs emphasize that in November 2011 (when the board signed the merger agreement) PDSi had zero debt and had

delivered seven sequential quarters of profitability including a record 2010 fiscal year. During the third quarter of 2011, plaintiffs point out that PDSi's total sales grew by 6 percent, that it did not use its line of credit, and that cash on hand grew from $1.3 to $1.5 million. The company is said to "enjoy some of the highest margins among electronic repair service companies," and "as recently as July 26, 2011, Pinnacle shares traded as high as $3.45 per share" and were a "Buy" recommendation for Yahoo! Finance. Thus, it is said, "the Company's true value is compromised by the consideration offered in the Proposed Transaction." In short, most alleged inadequacies in the proxy statement and the challenge to the fairness opinion by GBQ resolve themselves down to the $2.40 valuation of PDSi's stock. Indeed, only a valuation expert could readily understand references in the consolidated complaint to the "data and multiples * * * selected by GBQ in its analysis" that address "revenue, EBITDA, EBIT, EBITDA margin, Enterprise Value/LTM EBITDA," and so forth.

■■ {¶ 23} The mere fact that the dissenting-shareholder-appraisal statute, R.C. 1701.85, may end up as the primary focus of a dispute does not preclude an action for breach of fiduciary duty, so long as the action does not seek to overturn or modify the value paid in a cash-out merger. *Stepak v. Schey*, 51 Ohio St.3d 8, 553 N.E.2d 1072 (1990), syllabus. Yet once one looks past the stock valuation that appears to be the predominant focus of plaintiffs' case, questions about the fairness of other terms in the proposed merger agreement like a no-shop provision or breakup fee also "will be felt by all shareholders" or "charged to the corporation as a whole." *Kadel v. Dayton Superior Corp.*, 105 Ohio Misc.2d 11, 17, 731 N.E.2d 1244 (Montgomery C.P.2000). Closely viewed, the consolidated complaint contains nothing that truly differentiates any of the four named plaintiffs from the other public shareholders of PDSi. In such a case, Ohio law demands that claims shared in common by all stockholders be asserted in a derivative action (or simply raised by dissenting shareholders after a merger is approved, pursuant to R.C. 1701.85). The motions to dismiss the direct claims are therefore granted.

### 4. *The Derivative Claims*

{¶ 24} Derivative shareholder claims serve a salutary purpose. "The common law refused * * * to permit stockholders to call corporate managers to account in actions at law. The possibilities for abuse, thus presented, were not ignored by corporate officers and directors. Early in the 19th century, equity provided relief both in this country and in England. * * * The remedy made available in equity was the derivative suit, viewed in this country as a suit to enforce a *corporate* cause of action against officers, directors, and third parties. As elaborated in the cases, one precondition for the suit was a valid claim on which the corporation

could have sued; another was that the corporation itself had refused to proceed after suitable demand, unless excused by extraordinary conditions." (Emphasis sic.) *Ross v. Bernhard,* 396 U.S. 531, 534, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970).

{¶ 25} Plaintiffs concede that they made no demand on the PDSi board, saying that it would have been a futile and useless act for several reasons. First, they contend that the transaction was moving too fast and that "[t]his exigency made it necessary to act without making demand." Next, they assert that each of the six directors knew of the "wrongdoing" but nevertheless proceeded with the merger on terms agreed upon with Avnet. Each member of the board has been named in these suits, allegedly rendering them "hopelessly conflicted in making any supposedly independent determination whether to sue themselves." Foreseeing that PDSi's board might have been forced to sue third parties, demand is also said to be futile because such a suit would have involved unnamed persons "with whom they have extensive business and personal entanglements." Finally, making a demand might trigger liabilities outside the scope of directors and officers ("D & O") insurance coverage, exposing board members to personal liability. These are all conclusory allegations lacking specifics.

## 5. *The Requirements for a Derivative Lawsuit*

### A. The Basics.

{¶ 26} Civ.R. 23.1 provides:

In a derivative action brought by one or more legal or equitable owners of shares to enforce a right of a corporation, the corporation having failed to enforce a right which may properly be asserted by it, the complaint shall be verified and shall allege that the plaintiff was a shareholder at the time of the transaction of which he complains or that his share thereafter devolved on him by operation of law. The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors and, if necessary, from the shareholders and the reasons for his failure to obtain the action or for not making the effort. The derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of the shareholders similarly situated in enforcing the right of the corporation. The action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to shareholders in such manner as the court directs.

{¶ 27} Applying the rule, the Franklin County Court of Appeals has held that these are "mandatory requirements for maintaining a shareholder's derivative action" and that "complaining shareholders must '(1) spell out the efforts made to have directors or the other shareholders take the action demanded, (2) explain

why they failed in this effort or did not make it, and (3) show that they "fairly and adequately" represent the interests of other shareholders "similarly situated." ' " *Niehaus v. Columbus Maennerchor,* 10th Dist. No. 07AP–1024, 2008-Ohio-4067, 2008 WL 3319289, at ¶ 37, quoting *Weston v. Weston Paper & Mfg. Co.,* 74 Ohio St.3d 377, 379, 658 N.E.2d 1058. See also *Pullins v. Harmer,* 5th Dist. No. 09–CA–40, 2010-Ohio-2590, at ¶ 25–32, 2010 WL 2299152; *Sandesara v. PECO II, Inc.,* Cuyahoga C.P. No. CV–720332, 2010 Ohio Misc. LEXIS 565 (McMonagle, J.), and *Doe v. Malkov,* 10th Dist. No. 02AP–90, 2002-Ohio-7358, 2002 WL 31928645, at ¶ 20–29.

{¶ 28} The demand requirement is not a mere procedural technicality, and "[if] plaintiff[s] do[ ] not comply with the requirements of Rule 23.1, [they do not have] standing to bring suit." *Davis v. DCB Fin. Corp.,* 259 F.Supp.2d 664, 670 (S.D.Ohio 2003) (citing *Grand Council of Ohio v. Owens,* 86 Ohio App.3d 215, 222, 620 N.E.2d 234, (10th Dist.1993)). *In re Ferro Corp. Derivative Litig.,* 511 F.3d 611, 617 (6th Cir.2008); see also, *In re Keithley Instruments, Inc. Derivative Litig.,* 599 F.Supp.2d 908, 918 (N.D.Ohio 2009) (Lioi, J.); *Drage v. Procter & Gamble,* 119 Ohio App.3d 19, 694 N.E.2d 479 (1st Dist.1997).

{¶ 29} Distilling the essence of these holdings, it is clear that Ohio law is strict in requiring presuit demand on a corporate board of directors. This is because corporations are governed by the directors, and they must be provided the first opportunity to consider possible litigation just like any other matter of internal governance. The corollary rule is that it is presumed that a board of directors will act independently, in good faith, and having in mind the best interests of the corporation. These principals are grounded in the Ohio corporation code as well as common law. R.C. 1701.59(A) and 1701.59(C)(1).

### B. Futility

{¶ 30} Under Ohio law " '[f]utility means that the directors' minds are closed to argument and that they cannot properly exercise their business judgment in determining whether the suit should be filed. It is not enough to show that the directors simply disagree with a shareholder about filing a suit.' " (Citation omitted.) *In re Keithley Instruments,* 599 F.Supp.2d at 918. Thus, "[e]stablishing demand futility under Ohio law 'is not an easy task'." *Id.* at 918.

{¶ 31} "[D]emand futility must be assessed with respect to the particular causes of action that the board would otherwise be asked to consider if demand were made." *Lambrecht v. O'Neal* 773 F.Supp.2d 330, 341 (S.D.N.Y. 2011). To evaluate an assertion of futility, a court must look for particularized factual allegations—more than superficial conclusions—about why directors are unlikely to act responsibly on shareholder concerns. The Sixth Circuit has

observed that merely saying the directors would not want to sue themselves is an "argument which Ohio courts have soundly rejected" and that to accept such generalities would "eviscerate the demand requirement." *In re Ferro Corp.*, 511 F.3d at 623–624. Against these requirements the consolidated complaint offers no facts suggesting the PDSi board has shown itself to be antagonistic to shareholder rights, or that specific board members are directly involved in self-dealing with Avnet, or that the review process followed internally before the board recommended the merger was illusory or even superficial. Nothing said with any particularity portrays the PDSi board as having lost its independence or as lacking the ability to bring disinterested business judgment to bear if a demand had been made relative to the Avnet merger.

{¶ 32} Plaintiffs' suggestions that the PDSi board might lack D & O coverage, exposing members to personal liability or more generally that this board would never take action against themselves or unnamed others with whom they have extensive business and personal entanglements are merely conclusory and not fact-based. Such superficial statements do not satisfy Civ.R. 23.1. Furthermore, "the mere threat of personal liability is not sufficient, reasonable doubt as to the disinterestedness of a director * * * [unless] the particularized allegations of the complaint present 'a substantial likelihood' of liability on the part of a director." (Citations omitted.) *In re Keithley Instruments*, 599 F.Supp.2d at 919–920. Indeed, the potential personal liability of board members, or whether indemnification or D & O insurance for board members might apply, can be argued both ways in these cases. The argument that indemnity provisions or D & O insurance insulate the board so that it does not take seriously fiduciary obligations can be juxtaposed with the argument that if indemnity or D & O insurance is unavailable, the board members are exposed to personal liability if the board does take action. Hypothetical examples of bias-producing issues are no substitute for meaningful allegations of fact that show probable futility. Hypothetical examples are given no weight in view of the statutory presumption that corporate board members act in good faith.

C. The Alleged Inadequacy of the Proxy Statement

{¶ 33} Although the consolidated complaint claims to seek more information from the PDSi board because the proxy does not permit an informed decision by shareholders, PDSi is obligated to convey only material information in connection with the proposed transaction. There is no requirement that it overload shareholders with meaningless detail or offer all available information that might be deemed helpful by some hypothetical reader. For instance, management is ordinarily not obligated to discuss the panoply of possible alternatives to a course of action it is proposing, because too much information can be as misleading as too little. *In re 3Com Shareholders Litigation*, Ct. of

Chancery of Del., New Castle, No. 5067–CC, 2009 Del.Ch. LEXIS 215, *20. "Omitted facts are not material simply because they might be helpful," and so, for example, stockholders need not be given all the financial data they would need if they were making an independent determination of fair value in the first instance. *Skeen v. Jo–Ann Stores, Inc.*, 750 A.2d 1170, 1174 (Del.2000). Further, the law "does not require that a fiduciary disclose its underlying reasons for acting." *In re Sauer–Danfoss, Inc. Shareholders Litigation*, Ct. of Chancery of Del. No. 5162–VCL, 2011 WL 2519210, *12. A duty of disclosure applies when a corporation seeks stockholder approval of fundamental corporate changes such as this merger, but the adequacy of disclosure is captured under the well-defined concept of materiality.

{¶ 34} Securities law regards a fact as material when there is a substantial likelihood that it would have been viewed by a reasonable investor as having significantly altered the total mix of information available. In setting this standard, the Supreme Court acknowledged a concern that a lesser standard might bury shareholders in an avalanche of trivial information. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. ——, 131 S.Ct. 1309, 1318, 179 L.Ed.2d 398, 409 (2011), citing *Basic, Inc. v. Levinson*, 485 U.S. 224, 231–232, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), and *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 448–449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). Furthermore, federal securities law "do[es] not create an affirmative duty to disclose any and all material information." *Matrixx*, —— U.S. ——, 131 S.Ct. at 1321, 179 L.Ed.2d 398.

{¶ 35} Ohio uses the identical approach to materiality in a fraud or breach-of-fiduciary-duty context. *Saxe v. Dlusky*, 10th District No. 09AP–673, 2010-Ohio-5323, 2010 WL 4324198, ¶ 51.

{¶ 36} PDSi's proxy statements set out a remarkably straightforward narrative of how the business had progressed for the last several years and then found itself in negotiations with Avnet during 2011. Plaintiffs essentially ignored that detailed background in framing their cases. Yet given this backdrop, the proposed $2.40 share price (offered in cash, by a business believed able to pay it) represents more than a 100 percent premium on PDSi's stock price as of the trading day when the proposed merger was announced. That, and similarly important facts, cannot be trumped by superficial generalities such as the claim that all board members acted in breach of their obligations. There is a practical point here; after all, a higher price for PDSi shares would inure to the directors' benefit as much as to the other shareholders.

{¶ 37} The court is left with allegations concerning futility under Civ.R. 23.1 that are unfocused and conclusory. Essentially, they disregard the proxy statement that, fairly read, conveys a clear story suggesting no inference of any

misconduct at all. In short, nothing in this record suggests facts that might prove that the corporate board behaved improperly, or that a sensibly drawn presuit demand would have been futile.

### D. Lack of Verification

{¶ 38} Civ.R. 23.1 requires a derivative complaint to be verified. Until late on the afternoon before oral argument, no purported verification had been filed even though these cases had by then been pending nearly seven weeks. At the eleventh hour Mr. Spruill and Mr. Weiser (acting for the "Weiser Rev. Trust") filed short documents entitled "Verification." Both were dated weeks after the start of their cases. Nothing has ever been tendered by the other proposed plaintiffs, Messrs. Henkel and Weatherby.

{¶ 39} *Black's Law Dictionary* (9th Ed.2009) defines "verification" as "[a] formal declaration made in the presence of an authorized officer, such as a notary public, or (in some jurisdictions) under oath but not in the presence of such an officer, whereby one swears to the truth of the statements in the document." Ohio practice customarily uses affidavits, which are factual statements sworn to before a notary public. R.C. 1306.10. Federal law allows a sworn declaration to be made subject to the penalty for perjury without the formality of an attesting notary. 28 U.S.C. 1746.

{¶ 40} Mr. Spruill's purported verification says it was made "under penalty of perjury." However, the problem is that it did not identify a jurisdiction in which it was made or whose perjury law applied. (Spruill is a resident of Key West, Florida, according to his original complaint, but no address or jurisdiction is mentioned in the purported verification.) More importantly, one must question Mr. Spruill's terse, purported verification made only "to the best of my knowledge, information and belief" premised only upon a "review[ ] [of] the Amended Shareholder Derivative Petition." No document with that name exists. In and of itself the reference to "knowledge, information and belief" is slippery. Beyond that, the verbiage employed here yields a circuitous route in which the only point of factual reference is the lawyer's initial pleading rather than knowledge gained from witnesses who actually analyzed the proposed merger and PDSi's business affairs, or from other sources of genuine factual material that might be evidence at trial. The second purported verification tendered on these cases also did not identify a jurisdiction in which it was made. (The address shown in the original complaint for the Weiser Rev. Trust is in California.) This too is "[b]ased upon the investigation of its counsel" as relayed to Mr. Weiser, which is all that supplies his "knowledge, information, and belief." No affidavit of counsel backs up either plaintiff.

{¶ 41} The verification requirement must not erect too high or unrealistic a barrier to derivative suits. Otherwise, procedural rules may insulate management against meritorious claims. However, derivative actions—often derided as "strike suits[1]"—must not be filed casually. They put into motion demanding legal proceedings causing expense to defendants. They impose often urgent demands on a court. Derivative lawsuits can delay or erect costly barriers to completion of otherwise appropriate business activity that benefits the very business for which shareholders claim to sue. *Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363, 86 S.Ct. 845, 15 L.Ed.2d 807 (1966), is the leading case on the verification requirement. The Supreme Court recognized that verification was intended to preclude strike suits while not unreasonably impeding shareholder derivative actions. Mrs. Surowitz was a Hilton Hotels shareholder and longtime investor, but as an immigrant, she lacked much formal education or facility with the English language. Therefore, she was unable to personally supply a meaningful verification. But, Justice Black recognized, Mrs. Surowitz had invested based upon advice from her son-in-law, who was a graduate of Harvard Law School and who held a master's degree in economics from Columbia. Both her son-in-law and the plaintiff's lawyer supplied affidavits of merit. Ruling that reliance on such alternative sources of verification was appropriate, the Supreme Court reinstated her derivative suit.

{¶ 42} Nothing in this record demonstrates that any plaintiff or attorney or investment advisor or other person responsibly investigated the allegations made here. No one actually stands behind the statements in the consolidated complaint. So far as the chronology of events discloses, all four plaintiffs sued before they had any opportunity to review the draft proxy statement or GBQ's fairness opinion. Beyond all that, nothing in the record memorializes how many shares any plaintiff owns or when they bought them. Nothing is known about their individual investing or education. No one knows if any plaintiff had experience regularly following PDSi's affairs, such as reading annual reports or through other analysis. Nothing suggests that any meaningful investigation through an in-depth review of PDSi's public filings at the SEC preceded these suits. The absence of meaningful verification is another reason for dismissal.

{¶ 43} For all these reasons, all derivative claims fail and are dismissed.

## 6. *Avnet's Motion to Dismiss*

{¶ 44} Claims against the directors and Pinnacle Data Systems having been dismissed, no direct or derivative claims are available against Avnet and its Ohio

---

1. *Black's Law Dictionary* (9th Ed.2009) defines this as "[a] suit (esp. a derivative action), often based on no valid claim, brought either for nuisance value or as leverage to obtain a favorable or inflated settlement."

merger sub as well. Beyond that, independent reasons require dismissal of claims of aiding and abetting raised against Avnet.

{¶ 45} Assuming that an aiding-and-abetting claim is viable in this context under Ohio law, apparently a point upon which disagreement exists among appellate courts,[2] no proper claim is stated here. The consolidated complaint asserts that Avnet obtained sensitive, nonpublic information concerning PDSi and that so called no-shop and other features in the merger agreement will discourage other potential bidders. The difficulty is that Avnet has always been at arm's length from PDSi and its shareholders. Nevertheless, under customary rules for due diligence, it is understood that a proposed merger partner would receive inside information before a definitive contract could be made. There is no suggestion in the consolidated complaint that Avnet misused the due-diligence process, much less bribed members of the PDSi board to set up the merger or helped supply incomplete or misleading financial records to GBQ for its analysis. So far as facts pleaded by plaintiffs go, nothing out of the ordinary in a merger of this sort has occurred. Merely because during due diligence Avnet was given inside information on PDSi does not mean a fiduciary duty became owed to PDSi's shareholders. *See Buckingham, Doolittle & Burroughs, L.L.P. v. Bonasera*, 157 Ohio Misc.2d 1, 2010-Ohio-1677, 926 N.E.2d 375, at ¶ 31 (Franklin C.P.), and fiduciary-duty cases cited. No special trust or confidence gained through negotiation of the share price or during due diligence required Avnet to bid against itself in order to increase the value of a buyout for PDSi's shareholders. To the contrary, Avnet owed a duty to its own shareholders to strike a deal economically favorable to itself. *See Stanley Ferber & Assocs. v. Northeast Bancorp.*, Conn. Nos. 93–0344931 and 93–0344932, (November 17, 1993), 1993 WL 489334, *6. The claims against Avnet and the merger sub must independently be dismissed for failure to state a claim.

## 7.  *Conclusion*

{¶ 46} If this merger occurs, shareholders possess an adequate remedy at law under R.C. 1701.85 notwithstanding their claimed dissatisfaction with the $2.40 share price. They are entitled to nothing more. By separate judgments, all three cases are dismissed at plaintiffs' costs.

So ordered.

---

2.  Avnet asserts that *Federated Mgmt. Co. v. Coopers & Lybrand*, 137 Ohio App.3d 366, 738 N.E.2d 842 (10th Dist.2000) held that Ohio does not recognize a claim for aiding and abetting common-law tortious conduct, while acknowledging that *Kelley v. Buckley*, 193 Ohio App.3d 11, 2011-Ohio-1362, 950 N.E.2d 997, at ¶ 70 (8th Dist.) may be read otherwise.